THE STATE OF OHIO *v.* SIMS.

(No. CR-5732—Decided April 25, 1977.)

Court of Common Pleas of Cuyahoga County.

*Mr. John T. Corrigan,* prosecuting attorney, and *Mr. James A. Carney,* for plaintiff.

*Mr. Alan I. Goodman,* for defendant.

HITCHCOCK, J. (By assignment from Paulding County.) Ordinarily, it would seem that defendant's R. C. 2953.-21 petition for post-conviction relief should be easily and summarily dismissed when these facts are not disputed. Defendant was tried by a jury which heard the evidence in a three-day trial. On the fourth day, June 8, 1973, when the final arguments of counsel were made and the jury instructed by the judge, the defendant, free on bail, did not appear. At 5:30 P. M. of this day, the jury returned its verdict in defendant's absence finding him guilty as charged in respect to offenses committed shortly before midnight at the Fountain Bleu Lounge in Cleveland at E. 67th St. and Carnegie on August 24, 1972, as to three of five numbered counts specified in the indictment, to-wit: (2) Guilty of the armed robbery of Otis M. Bivins; (4) Guilty of the armed robbery of Maurice Presley; and (5) Guilty of the armed robbery of John Bennett. Counts charging the same offense in respect to (1) Geraldine Freeman and (3) Charles Jefferson were dismissed for lack of probative evidence at the end of the state's case because these persons could not be found to testify at the trial. Defendant was in this trial represented by Roger J. Hurley of the staff of The Legal Aid Society who in the past five years has defended over 100 persons in jury trials on felony counts and although he has kept no strict account knows that in approximately 50 percent of them the jury returned a verdict of "not guilty."

On appeal to the Court of Appeals defendant's conviction on each count was affirmed and the Supreme Court of Ohio, *sua sponte*, dismissed his further appeal for want of a substantial constitutional question.

Further, it is known that prior to his conviction in this case on three counts of armed robbery, defendant has a Juvenile Court record and was acquitted by a jury of multiple counts of armed robbery in one trial; and again acquitted of carrying a concealed weapon in another jury trial; and that in all these jury trials he was represented by the same counsel, Mr. Roger J. Hurley, who was observed by the writer as the presiding judge of the jury trial wherein defendant was, by the jury, acquitted of armed robbery. Also, numerous members of the Cleveland bar have informed the court that Mr. Hurley has a reputation as being one of the city's most competent and capable lawyers in the defense of criminal cases; and the court knows from personal observation as presiding judge of two jury trials wherein Mr. Hurley was defense counsel that he is a trial lawyer of high competence in the defense of criminal charges.

Still, if this court is to adhere to its own conviction of what is required of those who voluntarily take Ohio's judicial oath, defendant poses questions of uncommon difficulty in light of these additional facts.

The journal entry made after a review of the pleadings and record found that: "* * * Defendant failed to attend the concluding day of his trial and * * * that there is no substance to Defendant's claims numbered 3, 4, 7 and 8 charging he did not have competent representation because his counsel, Roger Hurley, failed respectively to: object to the jurisdiction of the trial court, raise the due process issue in respect to his lineup identification, ask the Court for a *voir dire* in respect to his in-court identification, and request discovery from the prosecutor; and that his claims numbered 1, 2, 5, and 6 alleging that he did not have competent representation because his counsel, Roger Hurley, failed respectively to: properly investigate his case, subpoena a certain witness, object to the validity of the affidavit and warrant as constitutionally impermissible, and

to consult fully with the petitioner, cannot be determined without considering additional evidence not in the record, and that defendant petitioner is indigent."

Alan I. Goodman was appointed counsel for defendant as per R. C. 2953.24 and defendant was returned to Cleveland, and on June 17 and 24, 1976, with defendant, defense counsel, and assistant prosecuting attorney James A. Carney present, evidence was adduced from which the court finds:

### I. Identification Statement.

That defense counsel, through an investigator for the legal aid society, did on March 6, 1973, obtain from Geraldine Freeman, barmaid on duty at The Fountain Bleu lounge on August 24, 1972, the day of the robbery, a statement which reads:

"I have veiwed [*sic*] two photographs showed to me by Mrs. Alice Peck on March 6, 1973, and I have initialed the same. None of the persons in those photographs were present or had anything to do with the robbery at the Fountain Bleu on August 24th, 1972.

"I make this statement freely and voluntarily knowing that Mrs. Peck is a [*sic*] investigator for the Defendant's Office and represent [*sic*] Jackie Ray Sims.

"No threat, promises or other consideration were given to me for me to make this statement.

"If Jackie Ray Sims is pictured on those photographs he did not take part in that robbery.

"(s) Geraldine A. Freeman

Geraldine A. Freeman"

The statement is typed upon a sheet of bond paper bearing the letterhead of The Legal Aid Society of Cleveland and the maker's signature is a bold one, reminiscent of some famous in history.[1]

---

[1] It may be that Geraldine Freeman gave her written statement out of fear, or for money, or for some other reason and doubtless Charles Jefferson had opportunity to appear but failed to do so. We can only speculate as to the motives for their conduct but the record does indicate that Geraldine Freeman was a person of competence who was not only at the scene of the robbery but was on duty there and possibly the only witness whose senses at the time were completely unimpaired

One of the photographs mentioned is undisputedly that of defendant Sims and two other men and appears as defendant's Exhibit B in the record.

## II. Alibi

Defense counsel did not interview either defendant's mother, Alice Richardson or his former wife, Billie Sims, who, defendant told his counsel, knew where he was for the five hours after 8:00 P. M. August 24, 1972, and it was not the Fountain Bleu Lounge which defendant vehemently claims was never visited by him until he interviewed Geraldine Freeman there in January, 1973.

Defense counsel is not sure (although he thinks he probably gave it to the police) what he did with the information that defendant emphatically claims he gave him as to what he had heard from likely sources was the true identity of the robbers at the Fountain Bleu on August 24, 1972. Defendant believes it was done by some or all of the following: one Steve (a. k. a. Arthur Cox) and one Tony (a. k. a. Anthony Costes or Custers or DeCoster) definitely; and perhaps Lewis Bailey, Daniel Boone, and Claiborne Sims, brother of defendant, were participants.

Counsel admits that he recalls defendant's claim of alibi and that he subpoenaed no witnesses in support of same. Just why he did not call the alibi witnesses he cannot recall. He believes that in several trials shortly before this one he had had bad experience with alibi testimony and probably felt that in this case alibi testimony resting only on the memory of close relatives uncorroborated by some solidly ascertainable fact or circumstance would do defendant no good, and might possibly harm the chance he might otherwise have to obtain a not guilty verdict. He thinks he gave the police the information acquired from his client about Steve and Tony. What, if anything, police did thereafter he never learned.

## III. The Affidavit and Warrant

In a direct fashion, defense counsel did not object to the affidavit and warrant as being constitutionally imper-

by alcohol. Still, three months before the trial she freely and voluntarily put in writing her conclusion that defendant was not a member of the robbing party.

missible, and as it is based upon the eyewitness testimony of at least three persons, there could hardly be sustainable objection without some strong evidence that the accusations were false. Counsel did object strenuously that the identification rested upon improper suggestion at the pre-indictment lineup occurring one week after the robbery. Further, it seems certain that although that procedure has been approved by the Court of Appeals and the Ohio Supreme Court, the evidence of the police conduct re the initial identification seems little more, if any, commendable than that upheld, five to four, in *Kirby* v. *Illinois* (1972), 406 U. S. 682, 92A S. Ct. 1877, 32 L. Ed. 2d 411.

For me, it seems regrettable that none of the Justices in *Kirby* made note of the chief circumstance indicating lack of mistake in the identification; i. e., that identification articles bearing the victim's name and belonging to him were found in defendant's possession only two days after the robbery. At this time he was stopped for questioning in connection with a different offense. He produced a wallet containing checks and a Social Security card bearing the name Willie Shard. A check of this name by the police revealed that a person with this name had reported being robbed two days previously. A police car fetched this complainant to the station where upon a first glance at Kirby and a buddy named Bean[2] declared with great spontaniety, "That's them," or words to such effect. Moreover, his in court identification appears to have been quite credible. Indictment occurred six weeks after arrest and was followed by trial and conviction.

In this case the state's witnesses all said that the rob-

---

[2]In *People* v. *Kirby* (1970), 121 Ill. App. 2d 323, 257 N. E. 2d 589, Kirby's conviction was unanimously affirmed by the Illinois Court of Appeals. The conviction of his companion Bean, equally guilty considering the evidence, was reversed by the same court by a 2 to 1 vote of the Justices. See *People* v. *Bean* (1970), 121 Ill. App. 2d 332, 257 N. E. 2d 562. The reason given was that at the time of the arrest of both men the police had good reason to arrest Kirby without a warrant on an unrelated charge, but had no good reason to then arrest Bean, also without a warrant, just for being in Kirby's company. Still Bean had, as did Kirby at the time, articles in his possession bearing identification information that they belonged to the victim Shard.

bery occurred in a dimly lit night club, but not dim enough to make their identification doubtful, after 11:00 o'clock P. M.; that there were at least five robbers acting in concert in a short period of time of perhaps two minutes; that they had never seen any of them before; and that it was seven days after the robbery when, at the police station, one of them positively, and one probably identified defendant Sims as a member of the robbing party. Another witness, Bennett, identified defendant at some time after September 1, 1972, at a single confrontation while defendant was in the county jail "lockup room."

Not so much as a scintilla of other evidence was ever produced linking Sims to the crime. No accomplice was ever apprehended, not one of the various items of jewelry or other property stolen by the robbers was ever recovered, nor were any fingerprints or other incontrovertible circumstances linking Sims to the robbery ever established. Consequently, his conviction rests 100 percent upon eye witness testimony in a situation not conducive to accurate and precise observation.[3] The witnesses, respectively; testified that the robbers took: (1) a handgun and $101 in money from Maurice Presley; (2) a purse containing, *inter alia,* $3 in money from Lenore Rudolph; (3) two wallets, a diamond cluster ring, a wrist watch, and $125 in money from John Bennett; (4) a purse from Geraldine Freeman; (5) a ring, a watch, and at least $90 (perhaps as much as $120) in money from Otis Bivins; and (6) $300 in money from Bobby L. Tolliver. The indictment also states that $7 in money was taken from Charles Jefferson.

------

[3]In the writer's 9th or 10th year at the bar he was told by one of Ohio's great trial lawyers, "I was admitted to the bar in 1909 and during my first year as a lawyer the Common Pleas Court of my county appointed me to defend 13 different men, each indicted for 1st degree murder. I tried all of these cases and in 9 of them the jury walked my client out of the court house a free man. That experience taught me this: 'That usually—not always, but usually—your best evidence is circumstantial evidence; and the reason is that usually—not always, but usually—your circumstantial evidence is the only evidence in the case that can't be lied about.'" In the over 25 years since no experience or learning has caused me to doubt the wisdom of this observation.

### IV. Miscellaneous

Defendant in his first letter to the court, following the hearing, in part, says:

"* * * There is one key witness (Geraldine Freeman) that must be found. Also, I believe any other person who was robbed in that place. The police should have records to show I stood in numberous [sic] lineups after becoming a suspect in this case. Your Honor I would take a polygraph test today along with Mr. Presley, Bivins, and the other victim to prove that only Presley said I was involved in that robbery (only after a heated argument with Bivins), and it will prove the lineup at that moment was illegal and moreso it will show—I had no involvement whatsoever in it. Detective G. Minton & Worthington can also take this test to prove what I say is true. * * *"

Further, in the course of the evidentiary hearings present counsel for defendant asserted that defendant had three times offered to take a polygraph test before the trial in respect to any aspect of the offenses charged in the five counts of the indictment but that said offer was never accepted by either the police or the prosecutor's office; moreover, that defendant still requested that he be given a polygraph examination by any competent examiner the court might select because such examination would result in solid corroboration of his testimony that he had no part in the robbery at the Fountain Bleu Lounge on August 24, 1972. It is the court's recollection that this assertion was made in the presence of counsel for the state who made no comment other than to indicate that results of such examinations are not admissible in evidence.

### THE ISSUES

As viewed by this court the first question for decision is: Did defendant have less than adequate representation by counsel because counsel failed to: (a) properly investigate his case, (b) subpoena certain witnesses, (c) object to the validity of the affidavit and warrant as constitutionally impermissible, (d) or fully consult with him? The court answers this question, "No," for the following reasons:

Counsel appears to have done everything competent counsel should have done, except he did not subpoena defendant's admitted alibi witnesses nor did he take measures to restrain Geraldine Freeman as a material witness after she had made her statement which she put in writing three months before the trial. This court cannot fault counsel's failure to call defendant's alibi witnesses in this case because they were defendant's mother and former wife and defendant disclosed no circumstance of fact which would lend any substantial credibility to their testimony. In perhaps a dozen jury trials presided over by this court alibi evidence was introduced by a defendant accused of crime. In only one case was it given any credence by either the jury or the court and in that case it was solidly corroborated by employment records kept by an established business. Moreover, information was later received by this court clearly indicating that this particular accused must truly have been innocent. Still he and his brother-in-law were both accused and his brother-in-law convicted by reason of identification testimony by robbery victims which could not have been correct. Consequently, an exercise of professional judgment not to call these alibi witnesses cannot be equated with incompetency.⁴ Likewise, counsel's

⁴During consideration of this case, and following the evidentiary hearings in June, 1976, present defense counsel called to the court's attention *U. S.* v. *DeCoster* (10/19/76) (C. A. D. C.) 20 Cr. L. 2080, wherein Judge Bazelon for the majority, Judge MacKinnon dissenting, held that the "total failure" of appointed counsel for an armed robbery defendant to interview witnesses or possible witnesses who might have aided an alibi defense for his client amounted to lack of effective representation and required the directing of a new trial. This was a case where, six years before, two police plainclothsmen observed three men rob a man, gave chase and arrested all three within minutes of and in the vicinity of the place of the robbery at which time all the robbers were then identified by the victim. Before the trial the victim suffered injury to his eyes such that he could not identify the robbers in court. Just how an alibi in the circumstances could be anything but fabricated is not shown, and especially when the two other men arrested with DeCoster entered guilty pleas and apparently all three were then represented by the same counsel. Why any defense counsel should be compelled to offer a defendant's 11th hour witnesses to establish an alibi in circumstances indicating no likelihood that such testi-

failure either to take Geraldine Freeman's video or other deposition or place her under restraint as a material witness after she made her statement on March 6, 1973, cannot be equated with inadequacy in the context of this case.

Counsel obviously expected to use this statement in cross examination of Geraldine Freeman upon her appearance as a witness for the state. And he had a right to expect her to appear for the state because she was named as defendant's armed robbery victim in count 1 of the indictment. When on June 7, 1973, the second day of the trial, she failed to appear as a witness for the state, it is evident that Mr. Hurley learned she was not going to be a witness for the state. At 2:14 P. M. of that day he caused to be filed with the Clerk a precipe requesting that the Sheriff subpoena "Geraldine Freeman, Cleveland Automobile Club, 6000 S. Marginal Road, Cleveland, Ohio, to appear on the 8th day of June at 9:30 o'clock A. M. to testify on behalf of the Defendant."

On the morning of June 8, 1973, neither defendant nor Geraldine Freeman appeared. Mr. Hurley, defense counsel, waived defendant's presence and the trial proceeded. Geraldine Freeman was called but she was not present. Thereupon the precipe was made a part of the record as Court's Ex. No. 1 and counsel rested his case for the defendant. The record shows no attempt by counsel to disclose to the court the nature of the testimony he expected Miss Freeman to give in behalf of the defendant, or any request by him for delay until a real effort could be made to locate her, or any claim of the right to compulsory process under the provisions of either Article I, Section 10 of the Ohio Constitution, or the 6th Amendment to the United States Constitution.

_____

mony could be true, on pain of being deemed incompetent, I fail to see. For me, it is simply ridiculous to declare that the Constitution requires, in all cases, the presentation of alibi testimony which cannot be substantiated by either an irrefutable factual circumstance or a credible witness. DeCoster's case is not this case and it seems certain he did not declare that a polygraph examination would show that he was innocent.

The second question is: Is defendant's conviction voidable for denial of a right guaranteed by the Constitution of either Ohio or the United States. The court answers this question, "Yes." The court finds that under both constitutions defendant did not receive the right to have "compulsory process" for witnesses in his favor in the person of Geraldine Freeman and/or the testimony of a qualified polygraph examiner, who, upon examination, reached a conclusion that defendant was not being deceptive in what he declared to be his knowledge, or lack of knowledge, in respect to the accusations against him made in the indictment. As the issue of compulsory process for Geraldine Freeman was never brought to the attention of either the trial court or the court of appeals this issue is not *res judicata*. *State* v. *Perry* (1967), 10 Ohio St. 2d 175, 226 N. E. 2d 104. And to say that it could have been in view of Geraldine Freeman's failure to appear as a witness for the state, and the rule precluding polygraph tests then in effect, is to expect the improbable, if not the impossible, of counsel. For an excellent and brief discussion of the traditional right of "compulsory process" see *State* v. *Bickham* (1945), 208 La. 1026, 24 So. 2d 65 interpreting the Louisiana Constitution which uses the identical operative words found in the 6th Amendment to the United States Constitution. Remarkably, extensive review of published Ohio decisions fails to reveal a single Ohio case dealing with the subject of "compulsory process."

Although traditional precedents clearly establish defendant's right to have Geraldine Freeman's testimony, there are none known to the court which have reached the conclusion which this court has reached; *i.e.*, that a defendant in a criminal case, at least in those cases resting only upon personal observation once made within a matter of a few seconds or minutes, has a right to be examined by a competent, experienced polygraph operator whose reputation for truth and veracity is unblemished, and if the examiner is able to reach a conclusion which favors the defendant's view of the issues, to have compulsory process for his testimony as a witness. Consequently, the court will explain how it has come to this conclusion.

Section 10, Article I of the Ohio Constitution entitled: "Trial for crimes; witness," in pertinent part, reads:

"* * * In any trial, in any court, the party accused shall be allowed to appear and defend in person and with counsel; to demand the nature and cause of the accusation against him, and to have a copy thereof; to meet the witnesses face to face, and *to have compulsory process to procure the attendance of witnesses in his behalf,* and a speedy public trial by an impartial jury of the county in which the offense is alleged to have been committed * * *." (Emphasis supplied.)

The Sixth Amendment to the United States Constitution, reads:

"In all criminal prosecutions the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed, which district shall have been previously ascertained by law, and to be informed of the nature and cause of the accusation; to be confronted with the witnesses against him; *to have compulsory process for obtaining witnesses in his favor,* and to have the assistance of counsel for his defense." (Emphasis supplied.)

It seems exceptional that the present 8 Words & Phrases (1951), under "compulsory process," makes reference to only 12 cases from five states (of which one case was in the United States District Court) and the latest of which is dated 1949, and that the 1977 cumulative supplement contains no reference to this phrase. Perhaps not many defendants have had witnesses in their favor who **were both known and unwilling** to appear without compulsory process.

As one having no quarrel with Mr. Justice Brandeis's view that "If we would guide by the light of reason, we must let our minds be bold," *New State Ice Co.* v. *Liebmann* (1932), 285 U. S. 262, at 311, 52 S. Ct. 371, at 386, 76 L. Ed. 747, and Mr. Justice Douglas's observation that "* * * constitutional questions are always open," *Gideon* v. *Wainwright* (1963), 372 U. S. 335, at 346, 83 S. Ct. 792, at 798, 9 L. Ed. 2d 799, I begin with the observation that in *Ferguson* v. *Georgia* (1961), 365 U. S. 570, 81 S. Ct. 756, 5 L. Ed.

2d 783; it was held that Georgia (the only state then still retaining the common law rule which, in 1789, had endured for 200 years,[⁵] making a person charged with a criminal offense incompetent to testify under oath in his own behalf at his own trial) could not by statute provide that he could make to the jury an unsworn statement, completely unassisted by anyone—not even his counsel—because of the 6th Amendment's provision for the "assistance of counsel" as applicable to the states by reason of the 14th Amendment as now interpreted by the Supreme Court of The United States.

Further, in *Washington* v. *Texas* (1967), 388 U. S. 14, 87A S. Ct. 1920, 18 L. Ed. 2d 1019, it was held that a Texas statute providing that persons charged as principals, accomplices or accessories, in the same crime cannot be introduced as witnesses for each other was invalid because it denied accused persons the right of "compulsory process" contrary to the 6th Amendment, as now held applicable to the states by reason of the 14th Amendment of our national constitution.

Of course, this court is aware of the fact that courts in this state and nation generally have denied the admissibility of the testimony of conclusions reached by the most competent operators of the polygraph (commonly called lie detector or lie detector machine) as to whether a particular examinee was being either deceptive or non-deceptive in respect to what he says he knows about particular events, especially criminal offenses, and his participation therein.

The reason most commonly given has been that the standard as stated in the first published decision, in respect to a simple prototype of the modern polygraph, has not been reached. See *Frye* v. *United States* (C. A. D. C. 1923),

[⁵]See 2 Wigmore on Evidence (3rd. Ed.), Section 575, where the origin of the common law rule is set out. Perhaps the Georgia experience tends to prove that the right of the defendant to testify in his own behalf has not been of any significant value to the person actually accused of crime in court. A comparative study of the half century of experience in Georgia beginning with 1916, with other states of simliar population, might produce some interesting insight in respect to such issue.

293 F. 1013.   That standard was, as stated by Justice Van Orsdel at page 1014:

"* * * Just when a scientific principle or discovery crosses the line between the experimental and demonstrable stages is difficult to define.   Somewhere in this twilight zone the evidential force of the principle must be recognized, and while courts will go a long way in admitting expert testimony deduced from a well-recognized scientific principle or discovery, the thing from which the deduction is made must be sufficiently established to have gained general acceptance in the particular field in which it belongs.

"We think the systolic blood pressure deception test has not yet gained such standing and scientific recognition among physiological and psychological authorities as would justify the courts in admitting expert testimony deduced from the discovery, development, and experiments thus far made."

This *Frye* case, tried well over a half century ago, was a pioneer effort to use only a systolic blood pressure test, a crude forerunner of the modern polygraph test, as corroboration of Frye's testimony that he was innocent.   The evidence was excluded, and similar evidence has continued to be excluded by many courts to this day.   More remarkable to this court is the fact that the courts citing this case as a precedent for excluding polygraph evidence have not apparently: (1) mentioned the fact that Frye, without the benefit of the only witness who could intelligently lend corroboration to his testimony, was in fact convicted of a murder he was found not to have committed after serving 3 years in prison, when his innocence was demonstrated by the confession of a third person, See N. Y. Judicial Council, Fourteenth Annual Report 265 (1948), or (2) considered the actual development of the modern polygraph device which has been an extremely effective device, in the hands of competent operators, for at least the past $\frac{1}{4}$ century.

Of course this court cannot escape its own knowledge of these texts based upon the observations, examinations and experiments reported:

Munsterberg, On The Witness Stand (1908), The McClure Company, New York.

Wigmore, The Principles of Judicial Proof (2d Ed. 1931), Little, Brown & Company, Boston.

Burtt, Legal Psychology (1931), Prentice-Hall (a work which has probably had much more neglect than it deserves).

Wigmore, Wigmore's Code of Evidence (3d ed. 1942), Little, Brown & Company, Boston.

Reid & Inbau, Truth and Deception, The Polygraph ("Lie Detector") Technique (1966), Williams & Wilkins Co., Baltimore.

Ferguson & Miller, The Polygraph in Court (1973), Charles C. Thomas, Publisher, Springfield, Ill.

Further, this court has had the privilege of reading several pages of the galley proof of the second edition of Reid and Inbau's work which has gone to press and which, at page 304, reports:

"Our actual case experiences over the years have involved the Polygraph examination (either personally or under our direct supervision) of over 100,000 persons suspected or accused of criminal offenses or involved in personnel investigations initiated by their employers.[104] On the basis of that experience we are confident that the technique, *when properly applied by a trained, competent examiner*, is very accurate in its indications. The percentage of *known* errors with the technique used in the laboratories of John E. Reid and Associates is less than 1 per cent. Of the remainder no diagnosis at all is attempted in about 5 to 10 per cent of the cases, because of such factors as the physiological or psychological impairment of the subjects.

"Several scientific studies have been made since 1971, which clearly disclose the fact of the Polygraph technique's high validity when properly used. Because of their importance, these studies, although already available in recognized journals, are reproduced as appendices in the concluding pages of this text.[105]

[The text footnotes read:]

"104 One of us (Reid) has been engaged in Polygraph testing as his sole professional interest for 35 years. In one recent year he tested or personally supervised the

testing by the examiners on his staff (John E. Reid and Associates, Chicago) of 6,950 persons involved in criminal or personnel investigations.

"105 Also see, Horvath, F.S., The accuracy and reliability of police Polygraphic ('lie detector') examiner's judgments of truth and deception: The effect of selected variables, Diss. Michigan State U., 1974."

This court's own experience and inquiry prior to receipt of its instant task has lead it to the conclusion that there is a wealth of proof existing among all the more than 1500 members of The American Polygraph Association, which is addressed P. O. Box 74, Linthicum Heights, MD. 21090, and near unanimity among all the lawyers who have made deep study of the technique for at least two decades now, that it is highly effective. Further, the general trustworthiness of the results of modern polygraph examinations, when conducted by competent operators of intelligence, experience, and unblemished reputation for truth and veracity, is higher than that reached by any other method for judging human deception or lack of it in respect to persons who have, or have not, participated in past events. Particularly, this is true of those facts which can only be proven by the present knowledge of persons whose personal interest may be intense. The court has no knowledge of a single intelligent person, who has seriously investigated the polygraph technique, who has not concluded that a qualified examiner's opinion, after examination, that a certain individual did or did not rob a bank is many times more credible in determining such fact than much eye-witness testimony to the contrary given in court or elsewhere.[a]

---

[a]Reid & Inbau, in their 1st edition of Truth and Deception—The Polygraph ("Lie Detector") Technique (1966), address their attention to the limitations of the technique and its likelihood of convicting any innocent person. This writer has no reason to doubt the conclusions then reached which the authors in the decade since have had no reason to change in their 2d edition, now being printed, to-wit:

"The principal limitation of the present Polygraph technique is the inability to detect in certain persons because of their lack of adequate responsiveness to the relevant questions as compared with their responsiveness to the control questions * * *." (*Id.*, at page 184.)

The great Michigan authority on homicide investigation, LeMoyne Snyder, M. D., for years a qualified member of both The American Medical Association and The American Bar Association, in 1950, in discussing lie detection said:

"* * * However, when compared to other types of evidence, which have a wide acceptance in the courts, there is little doubt that properly conducted polygraph tests are not more accurate than many of these. Eye-witness testimony is notoriously unreliable—even x-rays may be misleading.

"The use of this technique has become well established and recognized by scientific persons as a highly accurate, humane and effective means of differentiating truth from falsehood."

"* * *

"In my opinion the use of a polygraph by a competent operator is far superior to the employment of sedative drugs." Snyder, Homicide Investigation 94, 95 (6 Rev. of 1st Ed. 1944), Charles C. Thomas, Publisher, Springfield, Ill.

In the 1972 printing of the 2d edition (1967) of this work, still entitled Homicide Investigation, Chapter 6 entitled *Scientific Criminal Investigation* is written by Alex L. Gregory. In his preface Dr. Snyder says:

"Although there is always the possibility that a lying subject may evade detection because of the fact that his mental abnormality precludes a reliable Polygraph test, the writers are not aware of any case where a truthful person was diagnosed as lying because of the misleading indications produced by an unrecognized mental abnormality." (*Id.*, at page 199.)

Despite both a wide experience in investigatory procedure, and a reading of much writing on the subject, this author has not been able to discover a case where the Polygraph has endangered an innocent accused person. At present such possibility seems too remote as to constitute reason to delay general use of the polygraph. Reason would indicate that the innocent cannot have the reactions expected from the guilty unless one is attempting to conceal something which is present in the circumstances but is not connected with the subject of the accusation. The competent examiner, however, acquaints himself with the *known* circumstances of the event and fashions his questions so as to avoid the irrelevant event.

'"* * * Heretofore, too few guilty and too many innocent persons have been convicted of murder or other serious crimes. In the future, a successful investigation will necessitate all of the combined abilities of the police, physicians, scientists and investigators to bring about a just and fair solution.''

In Chapter 6, at page 94, Mr. Gregory has this to say concerning mechanical aids to interrogation:

"In all probability these techniques will soon seem as antiquated as does much of the police equipment of the early part of the century, but *at the present time they are extremely valuable when used properly and extremely dangerous when used improperly.* (Emphasis supplied)

At page 104, the same author substantiates this writer's experience in the trial of many cases, as follows:

"The honest but mistaken witness is one of the most serious problems in our system of justice. He not only convicts the innocent but he permits the guilty to go free, and unfortunately the mistaken witness is all too frequently the most positive.''

For me, Justice Van Orsdel, in 1923, could say confidently that "the systolic blood pressure deception test" had not then "attained some kind of scientific acceptability" of consequence because, admittedly, only pioneer efforts had been made in the field. My knowledge today, in 1977, however, causes me to declare that the modern polygraph instrument which simultaneously and continuously measures one's pulse and blood pressure, breathing, and the natural electrical current about one's skin as an examinee is being questioned, is highly effective, when employed by a knowlegeable, trained person of highest integrity, in disclosing deception practiced by those whose purpose is to deceive and in verifying lack of deception in those falsely accused. Moreover, I am confident that all the members of The American Polygraph Association (over 1500 of them) join me in this conviction. And although as with other humans inventions, it is not useful in all cases and not perfectly reliable in all cases, it is far superior to any other technique now known in determining a deception or lack of it in the testimony of a witness. In my understand-

ing, the polygraph discloses to the trained and competent hidden states of mind as the X-Ray discloses to the trained and competent hidden states of body function. Both are equally valid in determining the truth of facts in issue, and the results of both should be equally available to triers of fact.[7]

In recent years two trial judges have reached the conclusion that polygraph evidence is an effective tool in advancing the cause of truth in court. I concur with them, and now comment on their published decisions.

In *United States* v. *Ridling* (E. D. Mich. 1972), 350 F. Supp. 90, before Judge Charles W. Joiner, the defendant proposed to offer testimony of one or more polygraph experts in his behalf in respect to an accusation of perjury in Grand Jury testimony. Judge Joiner heard evidence from persons who are experts in the use of polygraphs to establish the value and reliability of the results of the tests. He found that the evidence supported the statements

---

[7]This court has knowledge of a criminal indictment occurring nearly 20 years ago where a prosecuting attorney indicated entry of a *nolle prosequi* if the defendant, who had no criminal record, could clear a polygraph examination. The accused, a man close to 40, was engaged in an occupation where a larceny conviction would have very grave economic consequences. The alleged offense occurred during a layoff which caused him much financial inconvenience. His counsel advised him of the possibility extended by the prosecutor. The accused said to his counsel, "What do you advise?" Counsel replied, "If you are 100% innocent, I advise you to take the test. If you are not, I advise you not to take it." The accused looked at the floor, he looked at the wall, he looked at the ceiling—while several seconds ticked away. Then he looked at his counsel and said, "I don't think I'll take it." Counsel assured him that he was exercising a right guaranteed him by the constitutions of both his state and nation. In the jury trial that followed he was found not guilty when the evidence showed a failure by the investigating officer to establish one important link in the chain of evidence necessary to proof beyond a reasonable doubt. As this defendant did pay his attorney fees it seems likely, that on the whole, something honest men can call freedom under law was advanced, and substantial justice done. Surely cases where the jury is either required to test the sufficiency of the state's proof, or to be society's shock absorber to absolve someone caught between the logic of declared law and human passions will not vanish if the true efficacy of polygraph examinations are recognized by courts.

made in his opinion and cited Reid and Inbau's 1966 work as containing a full discussion of the polygraph, as well as a full bibliography of writings on the subject. I concur with Judge Joiner's findings and conclusions and concur with his general conclusions and repeat these portions of his opinion:

At page 93:

"* * * Nothing, however, in the different techniques casts doubt upon the basic theory behind the polygraph. Experts assert that the record of one polygraph examination can be interpreted satisfactorily by another expert so long as that second expert knows the particular technique used in questioning the subject.

"Police departments throughout the United States, various parts of the Government of the United States and industry utilize polygraph test results in their day to day operations. Experts testified that the reliability of the opinion of a qualified polygraph expert was higher than the opinions of ballistic experts and as high as the opinions of fingerprint experts. [ª]

"All experts agreed that polygraph evidence would be a valuable aid in connection with determining the kinds of issues involved in this case and in the process of administering justice.

"Although polygraph testimony is sometimes referred to as experimental and scientific evidence, McCormick on Evidence, 2d Ed. 1972, page 505, the evidence in reality is opinion evidence. The interrogation must be carefully arranged and supervised. The polygraph recordings must be interpreted. Only a person skilled in this art and science is qualified to interpret the results and that interpretation is stated in the form of an opinion.

"At the beginning it must be noted that this, among

---

ªThere is no disagreement among fingerprint experts known to this court as to the validity and certainty of fingerprint identification. The area of difference of opinion comes in arriving at a conclusion as to whether or not, from a small portion of one's total prints left on some substance or object, there can be found sufficient identifying characteristics such that the examiner can be *reasonably certain* that they were left by a particular person.

all possible cases, is the best case for testing the admissibility of polygraph testimony. A perjury case is based on 'willfully' or 'knowingly' giving false evidence. The experts all agree that the polygraph examination is aimed exactly at this aspect of truth. A subject, they say, may be honestly mistaken as to a fact and, if he answers according to his honest belief, the operator will interpret the results as being a truthful answer. * * *''

Judge Joiner answers the objection that, given the aura of scientific acceptability, juries as triers of fact will be inclined to give too much weight to the examiner's opinion or that in the absence of a real qualification standard for examiners chance of fraud and mistake will be great, and, at page 96 says:

''The hurdle can be overcome, however, by the use of the Court's power to appoint experts, Federal Rules of Criminal Procedure, Rule 28; Proposed Rules of Evidence for U. S. District Courts, Rule 706. Because it may not be easy for the Court to determine the quality of the polygraph experts tendered by the defendant, it seems proper in such cases to cause polygraph experts of the Court's own choosing to be appointed who should be directed to test the defendant. The purpose of such test will be to provide an independent check on the opinion of the defendant's experts and to make certain that the subject is testable. In the event that the expert concludes positively that the subject is or is not telling the truth, the expert of the defendant and the expert of the Court may be produced and give testimony. In such a case, the Court's experts and the defendant's experts both agree that the subject is a person who can be tested appropriately and the testimony of each should be admitted, even though it might disagree on the ultimate issue. If, on the other hand, the Court's expert believes that it cannot be determined whether or not the subject is telling the truth, the opinion of both experts should be rejected. This result could be caused by the defendant's failure to cooperate with the Court's appointed expert or because the defendant is not a person who can be tested. In either event, doubt is cast upon the validity of

the testimony offered by the defendant, and it should be rejected.

"The use of the Court appointed expert, whether or not he agrees with the expert tendered by the defendant, is a practical solution to the problem presented by the fact that only minimal standards exist for polygraph experts.[⁹] It will in most cases permit the jury to hear the evidence.

"SELF INCRIMINATION

"If the polygraph results are to be offered against the defendant, either if the Court's witness disagrees with the expert tendered by the defendant or if polygraph experts are offered independently by the government, the privilege against self incrimination needs to be examined.

"The privilege can be waived. *Hanson* v. *United States*, 186 F. 2d 61 (8 Cir., 1951). When a defendant testifies, he waives the privilege. [Citations omitted.]

"A test cannot be made without the full cooperation of the defendant. It seems clear, then, that if adequate

---

⁹After a discussion of how The Trial Process might be affected Judge Joiner found that the argument that the jury will be displaced by a machine or a polygraph examiner lacks merit and concluded his opinion as follows:

"The evidence of polygraph experts pertaining to the polygraph examination of the defendant and their opinions will be admitted subject to the following terms and conditions:

"1. The parties will meet and will recommend to the Court three competent polygraph experts other than those offered by the defendant.

"2. The Court will appoint one or more of the experts to conduct a polygraph examination.

"3. The defendant will submit himself for such examination at an appointed time.

"4. The expert appointed by the Court will conduct the examination and report the results to the Court and to the counsel for both the defendant and the government.

"5. If the results show, in the opinion of the expert, either that the defendant was telling the truth or that he was not telling the truth on the issues directly involved in this case, the testimony of the defendant's experts and the Court's expert will be admitted.

"6. If the tests indicate that the examiner cannot determine whether the defendant is or is not telling the truth, none of the polygraph evidence will be admitted.

"In the event the defendant declines to participate or cooperate in the test, none of the polygraph evidence will be admitted."

warnings are given as to the possible use of the tests [omitting full citation of *Miranda* and *Escobedo* cases], the taking of the test itself is a waiver of the privilege.

"Finally it can be argued that the privilege is not really involved at all. A person may be required to put on a blouse for identification, * * * [citations to all examples omitted], give blood to determine alcohol content, * * * participate in a line up, * * * give examplars * * * and produce fingerprints * * *. The thrust of the opinions is that coercion to obtain a statement is the heart of the privilege.

"With the polygraph, there can be no coercion at the time the test is taken if it is to be a valid test. The evidence offered is the opinion of the expert that the witness is or is not telling the truth when he voluntarily makes a statement. It is another way of supporting or attacking credibility. It is not a violation of the privilege against self-incrimination.[10]"

In *State* v. *Hancock* (1974), 71 O. O. 2d 458, Judge Robert S. Kraft of the Hamilton County Common Pleas Court, tried two defendants accused of rape, a jury being waived. Defendants applied for authority to submit to a polygraph examination which was granted over the objection of the state. The prosecuting attorney was given opportunity to select an examiner which he declined. The court then gave the defendants that opportunity which they accepted. Mr. Lynn P. Marcy of West Dearborn, Michigan was chosen and he conducted an examination of both defendants Hancock and Patrick on December 27, 1973, and a second examination of Patrick on April 15, 1974, on which later date Mr. Marcy said he was prepared to offer an opinion within reasonable scientific certainty as to the truthfulness of the defendants' answers to certain relevant questions asked of each defendant.

[10]Ridling's counsel in this case has told the court that defendant Ridling was tried by a jury and found not guilty of perjury but without the use of any polygraph evidence. This was occasioned because of a severe breakdown in his health prior to trial involving a nervous condition making him unsuitable for the test. Nevertheless, highly qualified polygraph examiners, prior to Judge Joiner's decision, had examined him and reached the conclusion that he was not being deceptive in making his claim of innocence.

The opinion recites Mr. Marcy's extensive qualifications and experience as a polygraph examiner and an instructor in the art were placed on the record. Also, the fact that he had conducted over 8,000 polygraph examinations. The particular machine used is described and, at page 460, appear these paragraphs:

"The witness further testified that there are 10 schools in the United States accredited by the American Polygraph Association to train polygraph operators, the oldest being the Keeler Polygraph Institute which started in 1937 and the second oldest at the Army School, Ft. Gordon, Georgia, established in 1951.

"The witness testified further that in approximately 30 per cent of roughly 2500 of the cases in which he had been directly involved he was able to confirm or verify his results and the degree of reliability was in excess of 90 per cent."

The prosecuting attorney declined to cross examine Mr. Marcy. Other witnesses testified and established to Judge Kraft's satisfaction "not only the general degree of scientific acceptability of the equipment and procedure but also to establish the broad-base use of and reliance upon the equipment and procedure in the fields of medicine, law enforcement, business and industry," to-wit: Dr. Raymond Lipicky, Professor of Pharmacology and Professor of Medicine, University of Cincinnati; Dr. William E. Whitehead, Ph. D. in Psychology, a specialist in clinical psychology; Lieutenant Charles Reid, Hamilton, Ohio, Police Department and for 10 years a polygraph examiner; Detective Sergeant Hubert Burger, Cincinnati Police Department and a polygraph examiner for 6 years; Deputy Philip A. Endres of the Hamilton County Sheriff's Office who had conducted 650 tests since becoming a qualified polygraph examiner in 1971; and former Cincinnati Chief of Police Stanley R. Schrotel.

The record shows that this case, on appeal, was affirmed, in respect to issues not involving the polygraph evidence. That both defendants were found guilty of rape under Ohio's rape statute as in effect since January 1, 1974, a statute substantially differing from the prior rape

statute. Along with all the other evidence received was that of Mr. Marcy, the polygraph examiner, who gave opinion, after examination, that neither Hancock nor Patrick were being deceptive when they each stated that they used no force or violence in having sexual relations with the female complainant. On December 12, 1974, they were sentenced, the sentence was suspended, and each was placed on probation for three years. Neither is known to have since been a behavior problem.

The court does not fail to note that long before these cases were decided that John Henry Wigmore, perhaps the greatest intellect our legal profession has ever produced, and the long acknowledged preeminent authority on the law of evidence in this country, in the third edition of his one volume Code of Evidence, had this to say of the polygraph in 1942, in respect to its use to corroborate or discredit one accused of crime at page 198, Section 967:

"*Art. 2. Corroborating by Blood-Pressure Record.* The record of blood-pressure variations of an accused person, made during an interrogation while voluntarily submitting to the application of suitable apparatus (polygraph, electrocardiograph, 'lie-detector'), is admissible, either to corroborate or to discredit his testimony, *provided*

"(1) The apparatus is one accepted as standard in reliability, and

"(2) the record was made and is interpreted by a qualified expert, and

"(3) the apparatus was applied under an order of the Court,

"(a) requiring notice to the opponent for giving an opportunity to be present.

"(b) and requiring that the record when made be presented in evidence regardless of whether it corroborates or discredits the accused's testimony."

His footnote 2 reads: "In view of the progress of science, the few contrary rulings cannot be deemed final. However, the opportunities of charlatanry in the making and in the interpretation of such records are large, and therefore their pre-trial use in police-investigation will probably remain the most important one. If offered in

court, the above conditions are indispensable."

In this work he makes two other comments re the polygraph:

At page 188, Section 903:

"*Art. 2.* Whether a witness' testimony is false in one or more points may be tested by the use of the *polygraph* (audiograph, pneumograph, 'lie-detector'), when applied by a qualified expert and with the consent of the witness as provided in Rule 126, *post, §967.³*"

The footnote 3 reads: "This may suffice to represent the law of the future."

At page 221, Section 1101:

"*Par.* (f). The fact of having voluntarily submitted to interrogation during the application of a *blood-pressure-testing* apparatus (polygraph, electro-cardiograph, 'lie-detector') does not exclude a confession made *after* the removal of the apparatus.

"*Comment.* This follows from the general principle of Arts. 2 and 6.—(W. §999) No rulings seem to have been made."

R. David Broiles, member of the law firm of Hooper, Kerry, Chappell & Broiles, Fort Worth, Texas in a foreword to attorney readers of The Polygraph in Court says, in part:

"Did you ever have an innocent client convicted of a serious crime? Maybe you can not answer that question. After all, lawyers are not at the scene of the crime. They do not have any inside knowledge other than what their clients tell them and what they can determine and infer from the evidence. But lawyers, prosecutors and defense attorneys alike can go one step further. The defense attorney or prosecutor can go that one step further by requiring that his client or key witnesses submit to a polygraph examination.

"If you have never asked a client to take a polygraph examination maybe you need to ask yourself why. It is certainly not the expense, because as an investigative tool it is one of the least expensive. Perhaps you do not want to know whether or not your client is guilty or innocent. To know that you represent an innocent man only increases the

pressure and the awareness of the responsibility that goes with proper legal representation.

"If you care about your clients, and if you are willing to take that one additional step, then you will find this an interesting and important book.

"I have had an innocent client convicted of a crime he did not commit. I have had that client submit to a polygraph analysis which showed he was innocent. I have used the same information from the polygraph test to investigate the crime to the point where I felt that I knew who did commit the crime. The heart of my defense was that my client had voluntarily submitted to and been cleared by a competent polygraph examination. I failed in my effort to have the court consider this most important piece of evidence. As I look back on that first attempt to introduce and qualify the polygraph examiner and his test results, I realize how important and useful this book could have been to me.

"In writing this foreword I attempt to point out the areas in this book that are of assistance to a defense lawyer or prosecutor.

"* * *

"Polygraph tests help determine the truth. But before they can fully help us to achieve justice, they must be recognized by the courts. In Chapter 2 the authors reproduce a thorough and thoughtout legal brief for the admissibility of the results of a polygraph test. The authorities are cited in detail, and numerous cases not ordinarily available by the normal methods of research are presented. The argument speaks for itself, and without elaboration I would only add that as a first step toward an attempted presentation of polygraph test results in court, an attorney would do well by adopting this brief."

A second foreword for the same book was prepared by V. A. Leonard, B. S., M. A., Ph. D. and Honorary Life Member of the American Polygraph Association of Denton, Texas. It begins with these paragraphs:

"This Book, *The Polygraph In Court*, will hasten the day when the instrument and its associated techniques will be recognized by the judicial system on the same basis

as other expert testimony and scientific evidence. That day is long overdue.

"Judicial precedents supporting the admissibility of the polygraph are overwhelming. Expert testimony and scientific evidence now routinely accepted by the courts include, among others, latent fingerprint evidence, firearms identification, tool mark evidence, traces of hair, fiber and other materials from weapons and instruments of attack, document examination and identification, traces of blood, fingernail scrapings, traces of dusts, soils, metals, glass, ash, poisons and drugs, and other materials.

"One needs only to examine the requirements for admission to membership in the American Polygraph Association to recognize the professional stature of the polygraph examiner today. It is interesting to note that the polygraph is used extensively in Medical Schools throughout the country in their Departments of Psychiatry to implement their study of the emotions.

"As early as 1959, a survey revealed that police departments in more than 200 American cities and the state police in 48 states were making use of the polygraph. The survey further indicated the extent to which the polygraph is being employed in the Armed Forces, including the U. S. Air Force, the U. S. Marines and the Military Police. Parenthetically, the polygraph training program at the Provost Marshal General's School at Camp Gordon, Georgia, is conceded to be among the best and most comprehensive programs of its kind in the entire United States."

In their introduction to this same book the authors begin with these paragraphs:

"This text aims to present a rather comprehensive view of the facts and principles embodied in modern polygraphy, correlating these with analytic, descriptive, structural, legal and psychophysiological counterparts.

"For truth verification to prevail during all phases of pretrial, posttrial, presentencing, and postconviction situations, it becomes almost paramount that attorneys, judges and jurors realize when they are indulging in subjective speculation, frequently based on uncorroborated hearsay,

and then objectively do something about it.

"In this most modern twentieth century, there are far too many persons, subsequently proven innocent, regularly being accused, indicted, convicted, sentenced and incarcerated.

"By the same token, there are far too many criminals who described their crimes in minute detail, led police to bodies of their victims, and who have frankly admitted enslaving young people to hard narcotics, walking free on adjudged legal technicalities having little relationship to the fact that they did commit the crime.

"In this twentieth century there is far more deliberate, unbridled perjury in our trials than ever before. And yet, appellate courts, for the most part, have consistently ignored the most accurate and reliable method of ascertaining the truth thus far developed.

"That the infamous Frye decision in 1923, even though the prosecutor, jury and judge were later shown to have convicted an innocent man, could to this day be one of the main barriers against polygraph's admissibility into trial evidence seems incredibly inconceivable."

and concluded with these paragraphs:

"For whatever it is worth, *The Polygraph In Court* is designed to help eliminate costly and unnecessary trials. Its purpose is to show that through polygraphy there is a much higher degree of accuracy not only in assisting to bring the guilty to the bar of justice but also for protection of the innocent.

"Is it not true that prosecuting attorneys, with all the power at their disposal, are supposed to do everything within that power to protect the innocent?

"To every judge, juror, prosecuting and defense attorney, who are only men and women, also vehemently swayed by personal and political desires and prejudices, we can only say that justice is the great interest of man on earth. It is the ligament which holds civilized beings and civilized nations together. Wherever her temple stands, so long as it is duly honored, there is a foundation for general security, general happiness, and the improvement and progress of our country."

The authors' title their first chapter, *What It's All About*, from which the following paragraphs are gleaned: At page 11:

"If ever there was a time in the courts or the legislature, those who are selling truth, reliability, an improvement in the criminal system, something to shortcut it, something to eliminate unnecessary and costly trials, and give more assurance to the people should be heard.

"Some day there will be a guarantee that the innocent people who obey the law remain on the outside rather than the inside, and the idea will be received with more warmth, a great deal more warmth, than was ever the case in the past.

"Although the people are unhappy with the state of law and order, there has been so little attention paid to the accuracy of our criminal process that we stand just as good a chance today as we did in the past of putting an innocent man in prison due to misidentification or of turning a guilty one loose because of the suppression of some evidence illegally obtained.

"It is time for the profession of defending criminals to take a long hard look at its obligations. It is time for the bar to clear up all questions as to whether or not a lawyer has the duty to find out if his client is telling the truth, or whether he deliberately ought to avoid putting that question and simply raise a reasonable doubt, if he can do so, as a matter of course.

"Nobody profits by putting a guilty man on the street. We cannot imagine—except for those who are mercenary enough to enjoy the fees notwithstanding the result—that many lawyers of good integrity really sleep well at night knowing a sadistic murderer has been put back in society because they were able to find a loophole in the law." * * *

At page 14:

"In these United States if one is indicted and tried he can never win more than half of what he had before. The stigma of acquittal is a damnation that comes very close to that of imprisonment. The people will say, because they have been allowed to think this way for years, 'He did it or they wouldn't have tried him for it; the lawyer got him off.'

The counsel gets great credit when, indeed, nothing more than the truth was shown.

"The person who avoids trial through polygraphy enjoys as good a reputation as the one charged with paternity enjoys when he is cleared by a blood test, which shoots right through the trial system and locks up the case with a fixed result.

"Defense lawyers should recognize that it does not serve a particularly useful purpose to always stand on constitutional rights and attempt to procure acquittal in every case. More importantly, they should never use such tactics in a jury trial without homing in on the question now only they have access, because no one makes them read a 'Miranda' warning before they interrogate their own clients.

"The burden that rests on the shoulders of a defense lawyer who knows his client is innocent is a terrible one. It requires that he deliberatly inject into trial records error —that is to say, realize that the judge is disregarding a precedent foremost in the defense's mind and remain silent about it. On its face that might sound unethical until one realizes that if it is corrected and an error-free trial is run which results in an inaccurate verdict, a jury can be mistaken. It can take the word of some glib liar and disregard the testimony of an inarticulate, uneducated, unintelligent, but honest man who may be the defendant—whose credibility seldom is worth very much simply because he is the defendant.

"The defense doesn't want to be in the position of telling the innocent man who is on his way to prison, 'Chum, that's the end of the line. There's nothing to appeal. There is nothing more I can do.' Disregarding truth, he must try to get a reversal on technical grounds and go through the same ball game again and perhaps with the same results ad infinitum.

"This is not a satisfactory system. Prosecutors opposed to polygraph admissibility, or its use in a judicial proceeding, have been cutting their throats for years in order to win individual cases. The ethics of the matter are clear. Although a defense lawyer has a right and some-

times a duty to raise every defense for a man he knows to be guilty, there is no right, and everyone in law enforcement has contrary duty when there is even a suspicion that the defendant may be innocent. The prosecutor is there to protect him as well as society.

"If polygraphy was used more, judges would appreciate the true facts as many of the nation's leading lawyers already know them to be.

"Juries will not slavishly follow the polygraph as though it were the last word in every question of credibility. They will evaluate it just as they would an x-ray skiagraph or an electroencephalogram. Polygraphy would be nothing more than another aid to their determination as to what the facts are. Pretty soon the word would get out that at least the people brought to trial had turned down an opportunity to avoid the trial, which is the happiest result. Defense and prosecutors should sit down and agree on where the weaknesses are, if indeed any are claimed. We all know that much more rests on the ability of the polygraphist than on the instrument being used. Such could become tantamount to a handbook of the rules of evidence, useless to the non-lawyer but very valuable to someone who, on the spur of the moment, can use it as a tool, or as a scalpel to a doctor—just a knife to us, but to him the means to change hearts in a human being.

"If these things could be agreed upon by responsible lawyers and the polygraph technique utilized in a responsible fashion, it would jack the accuracy of our criminal justice system well into the high nineties among the cases that now go awry. And, perhaps 90 per cent of those cases could be straightened out.

"We ought to straighten them all. The day will always be with us when one innocent man will go to jail, and the day will always be with us when several guilty men will go free for technical reasons, even if not for reasons of inaccuracy or a jury mistake. But in modern times, when we have walked on the moon and are shooting for Mars, we believe it unforgivable that society has so long disregarded the polygraph with open eyes, although under the table it is painfully and sometimes felicitously aware of the tremend-

ous significance and value of this science which it supports *sotto voce* from its official circles.

"A lot more truth wouldn't hurt the country."

At page 17:

"Most of the people that commit crimes didn't expect to get caught. If they did, they expected that by hiring a magician, not a lawyer—and there aren't any of those, but people don't know it—they would get off; they would beat the rap. They have heard that it is easier now, through the assertion of technicalities, to perhaps win an acquittal, even though there is evidence of guilt available. This certainly does little to discourage crime or to encourage adherence to the rules.

"But, by the same taken, the man in the ghetto is rapidly disillusioned when, as a poor man, he's hauled in, accused, vilified, and perhaps convicted or at least put to trial, when his only crime was being poor and not very bright and unable to intelligently defend himself. He doesn't go back to his community with the kind of respect for law and order that is going to help him tell his brethren and his children that you can rely on our system and on the police if you behave yourself, and you won't be inconvenienced or punished."

And the reason for some 90 or more percent of these wrongly decided cases surely has to be attributable to the fact that our law has excluded from consideration the only information available able to lend true scientific corroboration to truthful testimony.

The Common Pleas Courts of Ohio currently consider and terminate approximately 90,000 felony indictments per year. If, adhering to practices long known to lack consistent and precise results, they err in the disposition of 1/10 of one percent of the considered cases, wrong dispositions are annually entered as to 90 persons; if they err in one percent of these cases, 900 dispositions are incorrect. If in 50 percent of these cases wrongly decided an innocent person is convicted (and my experience causes me to suspect that the number is more than one in 2000) then at least 45 persons, per year, in Ohio, are found guilty of crimes they did not commit. Further, it seems likely that

in some areas the percentage of error may reach or exceed one percent in the verdict of juries or the findings of judges. My examination of the polygraph technique tells me that its use by honorable, talented, trained and experienced polygraph examiners with the results presented to the triers of fact should, indubitably, reduce the present number of errors by 90 percent or more. The reason for the bulk of today's judicial errors, my mental processes tell me, has to be attributable to the fact that our law has excluded from consideration by the triers of fact the only available information able to lend true corroboration to or disproof of much testimony. Particularly is this true of those cases where the correct answer depends upon perceiving which witness is telling the truth where there is substantial variation in crucial testimony not corroborated by irrefutable and established circumstances of fact.[11]

There is, of course, *no way presently available by which we can know with absolute certainty when* by the action of court and jury, any person has been convicted of some offense of which he is innocent. Certainly all of us with years of experience know that in a number of cases there is room for substantial error in either verdicts of juries or the findings of judges, which our system of appellate courts is designed to correct.

---

[11]This court cannot, of course, forget instruction in forensic proof received as a new special agent at the F. B. I. Academy in December, 1940 and January, 1941, followed by experience as an investigator; or his experience as an instructor of criminal investigation courses in schools of The Provost Marshal General between July, 1942 and December, 1944 where many students were experienced police investigators; or the knowledge there gained of what the Army was then able to learn of the polygraph and its uses; and six years experience as the protection chief of a large Pittsburgh store.

Moreover, the court's own experience in both being subjected to unexpected, bizarre, staged events followed by examination of one's observations thereof, and of conducting like experiments on others has also been convincing that eye witness testimony, in many types of situations, can rarely be both correct and complete in many important details. Particularly is this true as to the identification of persons whom the witness has never before seen and sees only for a few seconds or minutes and then does not see again until after a substantial lapse of time.

Having given this matter some reflection, I must say that our present system of the administration of the criminal law has possibly become both so complex, so ineffiecient, and so expensive as often to fail to provide a salutary practical administration of criminal justice where the unoffending citizen striving to live uprightly is equally well protected from (1) overzealous and unskilled police as well as from (2) predatory individuals who pursue crime as a way of life, instead of only the former.

It seems to me that the chief ingredients leading to the present state of affairs has been a perception by appellate courts: (1) that too often the quality of proof of the facts produced at the trial has not been convincing that the person convicted is truly guilty; (2) that our law should almost never, if ever, declare an innocent person to be guilty; (3) that innocent defendants who testify in their own defense (admittedly a low percentage of the total cases) frequently are not believed by either juries or judges because there is no trustworthy evidence by which, with a high degree of certainty, an accused person may demonstrate that he is being truthful and his accusers either mistaken or untruthful;[12] and (4) that too often the sentence imposed is strongly felt to be out of all proportion to the offense. With-

---

[12]The case of State, ex rel. Sheppard, v. Koblentz (1962), 174 Ohio St. 120, 187 N. E. 2d. 40, certiorari denied 373 U. S. 911, 83 S. Ct. 1301, 10 L. Ed. 2d 413, is remembered by the writer. For me it was regrettable that neither the Attorney General nor the Governor saw fit at that time to employ John E. Reid, or other experienced polygraph examiner of great competence, to administer to Dr. Sheppard a polygraph test and to let the results thereof be known. How the results of any such test could have hindered either the cause of truth or justice, I am unable to perceive. My conviction is that had such an examiner, or two or three such, then concluded that Dr. Sheppard was being truthful in telling what he said he knew of his wife's death, he should have received a pardon, and if a contrary conclusion had been reached that fact should have been published in corroboration of the jury's verdict. My experience, and the experience of others which has been told me, convinces me that the odds against Dr. Sheppard deceiving such an examiner were remarkably remote. And this conclusion presumes that at that time Dr. Sheppard well understood the science underlying the polygraph technique. Nothing which has happened since has caused me to alter my original view.

out the aid of the polygraph technique, or some other with as great or greater effectiveness in lie detection, and a deep concern for the advancement of something honest men may call freedom under law[13] which our Constitutions are designed to advance, the ruling case law of our appellate courts has produced a forest of precedents which possibly have the unsalutary effect of requiring that officers of the state loose in society too many vicious individuals whose well proven past conduct and present state of mind is definitely not conducive to anything which can honestly be called general good. Our appellate courts are rightly concerned to maintain a free society under our constitutions wherein the unoffending are generally protected from the predatory, whether the latter be officials or other

[13]The writer has never been either a governor with clemency powers or the legal adviser of such. Knowledge of the work of the attorney-author Earle Stanley Gardner and his Court of Last Resort has caused me to wonder why no such executive (so far as I have been able to discover) has ever issued a general order re clemency that every person sentenced for a long prison term could either (1) appeal for justice, or (2) appeal for mercy.

In the first type the appellant claims that despite verdict and sentence he is truly innocent of the charge of which he is found guilty. Such person's claims would be referred to three highly qualified polygraph examiners to whom the appellant would be required to voluntarily submit for three independent examinations as each such examiner might deem necessary to arrive at the truth of appellant's claim. Full cooperation by the subject in the administration of each examination would be required. Any individual receiving a unanimous finding of innocence would receive a complete pardon.

In the second type the appellant would be required to admit that his conviction was correct and deserved and that all appeals re the legal correctness thereof were abandoned. His only claim is that the sentence is greater than he can bear or, in the circumstances, is grossly excessive for a specified reason. Such persons would be referred to three very competent persons with an excellent knowledge of psychology and human behavior who would require that the subject demonstrate why he was deserving of clemency. Upon inquiry and hearing such group would fashion a program of training and conduct, tested occasionally by polygraph examination as to the bona fides of subject's true intentions, whereby he could upon successful completion, win release within 3, 4 or 5 years; this being the time required by most persons in which to learn something of consequence upon which to base a worthwhile vocation.

private citizens. It seems questionable whether or not the present forest of precedents contributes toward such a society in a salutary and practical way.

No doubt there are many reasons why our trial and appellate courts have for so long and so consistently resisted use of the polygraph in court. Some of them are perceived to be: Probably every adult or near adult has had some experience in lying and early discovered the attitude of his or her parents, grandparents, guardians or friends in respect to the subject; society often regards the harmless or white lie (so-called) which avoids friction and the sting of painful personal truth as admirable rather than the contrary in social intercourse; probably most adults would lie to escape death or other truly great calamity; and how does one respond to degrading questions asked only to cause embarrassment; anyone with true skill in lie detection could be subject to great pressures to shade the truth a bit in particular cases for either money or other cause; all parties in a court proceeding would want their own expert with his or her own opinion and how could inevitable conflicting results be fairly dealt with; when there are no standards prescribed by legislation what standards—if any—should a court fashion; if the polygraph is used in criminal cases would the jury system wither away; if used in criminal cases, what use—if any —could be sanctioned in civil cases; admitting that there are truly great polygraph examiners such as John E. Reid, Leonard Harrelson, Lynn Marcy, Alex Gregory and Charles Zimmerman of The American Polygraph Association, are there enough truly well qualified examiners to provide a salutary level of service to all the courts of the country; and just how can this recent technological development be managed judicially to serve the cause of truth and justice in a salutary fashion when the present experts admit that the technique is not as perfect as they wish it were? Other reasons no doubt can be listed but these, I believe, embrace a fair range of reasons many judicial minds, who have not had opportunity to explore the polygraph technique in depth, and even some who may have

had that opportunity, hesitate to enter what strikes them as an uncharted sea.

But just as Christopher Columbus concluded it was time on August 3, 1492, to sail west from Palos if the truth about the world lying in that direction were to be ascertained, this court has reached the conclusion that if justice based on truth is to prevail in greater measure in our land it is time this 25th day of April, 1977, to begin the sailing of this uncharted sea at Cleveland in this court.

Having found the defendant Jackie Ray Sims' verdicts of guilty and the judgment of sentence imposed as a result on May 30, 1974, voidable for failure to have the benefit of "compulsory process" as provided by Section 10, Article I of the Ohio Constitution; which benefit is equally provided by the 6th Amendment to the United States Constitution, the statute is consulted for the remedy to be provided.

R. C. 2953.21 (G) reads:

"If the court finds grounds for granting relief, it shall, by its judgment, vacate and set aside the judgment, and shall, in the case of a prisoner in custody, discharge or resentence him or grant a new trial as may appear appropriate. The court may also make supplementary orders to the relief granted, concerning such matters as rearraignment, retrial, custody and bail.

Before proceeding further it should be noted that Ohio's proposed Rules of Evidence contains this provision:

"Rule 706

"COURT APPOINTED EXPERTS

"(A) Appointment. The court may on its own motion or on the motion of any party enter an order to show cause why expert witnesses should not be appointed and may request the parties to submit nominations. The court may appoint expert witnesses of its own selection. An expert witness shall not be appointed by the court unless he consents to act. A witness so appointed shall be informed of his duties by the court in writing, a copy of which shall be filed with the Clerk, or at a conference in

which the parties shall have opportunity to participate. A witness so appointed shall advise the parties of his findings, if any; his deposition may be taken by any party; and he may be called to testify by the court or any party. He shall be subject to cross-examination by each party, including a party calling him as a witness.

"(B) Compensation. Expert witnesses so appointed are entitled to reasonable compensation in whatever sum the court may allow. The compensation thus fixed is payable from funds which may be provided by law in criminal cases. In civil actions and proceedings the compensation shall be paid by the parties in such proportion and at such time as the court directs, and thereafter charged in like manner as other costs.

"(C) Disclosure of appointment. In the exercise of its discretion, the court may authorize disclosure to the jury of the fact that the court appointed the expert witness.

"(D) Parties experts of own selection. Nothing in this rule limits the parties in calling expert witnesses of their own selection."

The court has confidence that the proposed rule, although not in effect as yet, is a salutary one for providing a greater measure of truth in court trials and is suggestive of a proper formula for the court in the exercise of its R. C. 2953.21(G) powers to make "supplementary orders."

Consequently, the court's order will vacate and set aside both (1) the verdict of guilty as to counts 2, 4 and 5 of the indictment, each charging defendant with aggravated robbery returned by the jury on June 8, 1973, and (2) the judgment entered on May 30, 1974, sentencing defendant to be imprisoned "to a minimum of seven years to a maximum of 25 years" in "The Ohio Penitentiary," grant defendant a new trial at which he shall have the benefit of the testimony of Geraldine Freeman if she can be found, also that of a qualified polygraph examiner should defendant submit himself for such examination and fully abiding all the terms and conditions of such examin-

ation as required by the examiner, understanding that he has a right to decline such examination and that if he does submit to such examination and the results are not favorable to him, the examiner may be called as a witness for the state. Also, that if the results are inconclusive such that the examiner cannot reach a confident conclusion that defendant is being either truthful or deceptive in his testimony, or is one of those persons who cannot be satisfactorily tested the fact of any tests or attempted tests and their results shall not be disclosed to or mentioned to the jury in any way.

Pending a retrial, the defendant is released on his own recognizance so long as he gives no good cause for arrest, in which event same will be revoked. Said retrial shall be begun within 90 days from the vacation of sentence, subject to a continuance if same appears necessary in order to make legitimate effort to locate all necessary witnesses.

This court will not deem any polygraph examiner qualified to act as witness in the retrial who has not: (1) attained the age of 25 years; (2) successfully completed at least two full years of college level academic study in a recognized field of knowledge after completing high school or its equivalent; (3) successfully completed a recognized school giving instruction in the polygraph technique; (4) been employed for more than one year full time or spending (over 75 percent of his working time) in conducting polygraph examinations; (5) conducted more than 1,000 polygraph examinations; and (6) free of involvement in any adult conduct casting reflection on his truth or veracity or indicating that his testimony can be influenced by the payment of money or other extraneous force. In the alternative, any person who has been employed full time (defined as being in excess of 75 percent of his total working time) for a period of 10 full years or more and is presently so employed as his regular, full time and chief occupation and who is also free of involvement in any adult conduct reflecting adversely on his or her credibility, will also be deemed to be a qualified examiner.

The court is aware that a requirement that polygraph examiners, to qualify as witnesses in court, be free from involvement in any event adversely reflecting on credibility seems to accord them less than equal protection of the law in comparison with other experts. Still as the technique directly concerns and affects the adjudicative function of determining factual truth where charlatanry can properly have no place I deem objection to an examiner's testifying when there is anything in his adult history indicating lack of the highest standards for truth and veracity should be sustained.

Noting that the defendant is presently indigent and that both his letter to the court and his counsel have requested a polygraph examination the court has ascertained to its own satisfaction that Mr. Eugene P. Demopolous, now employed as a full time polygraph examiner since 1972 by the Ohio Bureau of Criminal Identification and Investigation of the Office of the Attorney General of Ohio, Northeast Branch Lab, 3333 Brecksville Road, Richfield, Ohio, 44286, is fully qualified, under standards prescribed by this court, to conduct polygraph examinations and give testimony in court as to the opinions reached by him as a result of such examinations. If defendant, after being advised by counsel that any results not in his favor will be available to the state on retrial, does request such examination within 20 days of his release, same will be ordered, and if favorable to defendant, will be admitted in evidence, at any retrial. The State will, of course, be given opportunity to challenge the authenticity of any opinion reached by the examiner.

This opinion sets forth the court's findings of facts and conclusions of law in the circumstances presented. A judgment entry agreeable thereto is filed herewith.

*Judgment accordingly.*