Joseph D. Quinn, Jr., J.
In -this criminal action, defendant, who has been indicted on one count of criminally selling a controlled substance in the (third degree, in violation of subdivision 1 of section 220.39 of1 the Penal Law, and on one count of criminal possession of a controlled substance in the third degree, in violation .of subdivision 1 of section 220.16 of the Penal Law, has moved upon ,an order to sho-w cause made by the undersigned for relief of a varied nature.
In the lltih branch of ’his application, defendant prays for an order dismissing the indictment against him in the interest of justice pursuant to CPL 210.20 (sulbd. 1, par. [i]) and CPL 210.40. The granting or withholding of that type of relief rests solely in the sound discretion of the court.. This remedy may be traeed back to the common-law power of Nolle prosequi which originally lodged with the Attorney-General and then later with the District Attorney.
The Legislature transferred that power (to the court when it enacted section 671 of the former -Code of Criminal Procedure. Under the prior law, only the District Attorney or the court, sua sponte, could apply for dismissal of an indictment in the interest of justice. CPL 210.40 substantially restates the provisions of the old code, but it also allows a defendant to initiate the motion. (Cf. People v. Graydon, 69 Misc 2d 574, 577.)
It was true under the common law, it was true under former section -671, and it is true under the present CPL 210.40, that *319 this power is one which should only be exercised ‘ ‘ in appropriate but rare circumstances to allow the letter of the law gracefully and charitably to succumb to the spirit of justice.” (People v. Davis, 55 Misc 2d, 656, 659.) “ The power to discontinue prosecution of a crime vested * * * in the court has little or nothing to do with the legal or factual merits of the charge. Nor is it concerned with the guilt or innocence of the defendant. Such a dismissal is concerned * * * solely with principles of justice. (See State v. McDonald, 10 Okla. Cr. 413.) ” (People v. Quill, 11 Misc 2d 512, 513; People v. Clayton, 41 A D 2d 204, 206-208.)
Defendant is 47-year-old black male who is a civil servant employed by the County of Westchester as a cook. An inspection of his past criminal record discloses convictions for trespassing in North Carolina in 1948, larceny involving less than $50 in North Carolina in 1949, possession and transportation of untaxed alcohol in New Jersey in 1958, and for two old law marijuana misdemeanor possession offenses in this county in 1964. He received one year concurrent sentences to the county penitentiary in consequence of these last two convictions. From the time of his release after serving those sentences until his arrest on May 1, 1974, on the present charges, defendant had no other brush with the law. In addition to the current criminal charges which have been lodged against him, defendant is faced with a disciplinary proceeding under the Civil Service Law which was triggered by his most recent arrest and prosecution.
According to his moving affidavit, defendant was off from work on May 29, 1974, and he was in White Plains shopping. The following is his version of his encounter with the police on that day: “ I had just exited from a record shop known as B & R on Post Road located next door to W & J Sloane’s Furniture clearance center. As I was walking along the street, someone called to me who is known as ‘ Butch ’ Westmoreland. I stopped and started to talk to him. As I was talking to him, a police officer came up and stated ‘ Hey you, what did you give to him? ’ I replied in the negative. The police officer then desired [sic] to search me. I removed everything from my pockets and laid them on the ledge of Avis Rent A Car. There was no contraband or anything illegal in my possession. The police officer then turned to Westmoreland and directed him to take his things out of his pockets and put them down on the ground. Westmoreland then removed items from his pocket and put them on the ground. Among the items, which were put on the ground by Westmoreland, was a glassine envelope which later *320 turned out to have a small quantity of heroin in it. The police officer contended that I had passed this one particular glassine envelope of heroin to Westmoreland anid I vigorously denied it. We were both taken to the police station in White Plains and strip searched. At the police station in White Plains, Westmoreland informed the police that he had not been given the glassine envelope by myself. The police officer, Blaze [sic] Filardi, nevertheless insisted that I had given the glassine envelope to Westmoreland. In any event, the police allowed me to leave the police station and no charges were filed against me at that time. ” (Emphasis added.)
Defendant was arrested ¡on the following day, May 30, 1974, and charged with criminal possession of heroin and with criminal sale of that substance to Westmoreland.
On June 14, 1974, a preliminary hearing was held in the City Court of White Plains upon a felony information which had been filed against defendant. The only witness called was the police officer Blaise Filardi
In substance, this witness testified that, at about 10:00 p.m. on the evening of May 29, 1974, he was on patrol with officer Burnett on West Post Road in White Plains in the vicinity of Chimes Diner when he observed defendant pass a glassine bag behind his back to a man whom he referred to as Eugene Westmoreland ; that he walked up to the men and began questioning Westmoreland; that as he was talking to ¡him he ‘1 observed the glassine bag behind the foot of Westmoreland”; that Westmoreland “ .actually dropped it when I was talking to him; that he, the witness, picked up the glassine bag, noted that it contained a “powdered substance ” and arrested both defendant and Westmoreland, and took both men to police headquarters where he searched them, finding nothing on defendant and only “ marijuana rolled up in rolling paper ” on Westmoreland.
Upon cross-examination at the preliminary hearing, there was a marked discrepancy in officer Filardi’s testimony regarding the relative positioning of himself, defendant and the man Westmoreland during the purported bag-passing incident. At one point, the officer stated that defendant stood facing him and between him and Westmoreland as the act occurred. Later on, this witness placed 'himself behind both of these men when the act of passing occurred, and he positioned defendant alongside of Westmoreland.
Apparently this inconsistency was of no moment to the Magistrate, for the point was never explored, and, at the close of the hearing, defendant was held for the Grand Jury. At that *321 juncture, defendant’s then counsel went on record to reserve his client’s right to appear before the Grand Jury.
On argument of this omnibus motion, defendant’s current attorney informed us that defendant had in fact waived immunity and had testified in the proceeding before the Grand Jury. Alluding to .what he termed.an illegal “ street search ” of defendant and Westmoreland ion the night of the 29th of May, 1974, defense counsel branded officer Filardi’s account of the dropped glassine bag as being no more than “ dropsy” testimony, calculated to establish the legality of the warrantless searches.
Along these lines, defense counsel advised this court that, although Westmoreland had fled the jurisdiction and was unavailable to contradict the police, an acquaintance of defendant’s, a woman named Faith Clymer, who had viewed the search in question, had testified before the Grand Jury in defendant’s behalf. ,Speculating that an inspection of the Grand Jury minutes would demonstrate the contrived nature of the police officer’s testimony and thus lead to a dismissal of the indictment for want of legally sufficient proof, defense counsel orally applied for such relief. Under what we viewed to be the peculiar circumstances of this case, we granted this application out of hand, and without protest from the prosecutor, who, then and there, willingly handed up a transcript of the proceedings before the Grand Jury.
We are compelled to say, in all candor, that it was more an impulse to get at the truth here than it was a firm conviction that the proof .before the Grand Jury was thin which motivated us to agree to read the minutes of the proceeding before that body. Without a doubt, the claim of fabrication on the pant of the police was .a contributing factor. Such an assertion, when made under the conditions which appear to obtain here, is bound to arouse the suspicions of the court and to invite close scrutiny of all available proof. (Cf. People v. Berrios, 28 N Y 2d 361, 369-372.)
More than .this, we were impressed by the lengths to which defendant had gone in an attempt to exonerate himself. Not only did he go voluntarily before the Grand Jury and bring in an independent witness to support his theory as to the role played by the police in this case, but he had also offered to submit to a polygraph teat to demonstrate his veracity. In this regard, defendant, quite naturally, has proposed that officer Filardi undergo the same test.
On this subject of polygraph or lie detector tests, we feel constrained to remark that, in the present state of the law in New *322 York, we could not allow such tests to be taken and admitted in evidence in this case as an aid to resolving the issues of credibility which have been presented. This would be true, even if the People and defendant were to stipulate that the tests be so utilized. (Cf. Pereira v. Pereira, 35 N Y 2d 301, 306-308.)
Turning then to the Grand Jury minutes, the court notes that officer Filardi was again called as a witness against defendant. In sharp contrast to his performance at ¡the preliminary hearing, the officer’s testimony on this latter occasion might best be characterized as extremely brief and guarded.
This time, July 3, 1974, this ¡witness stated that on the evening of May 29, 1974, he “ observed James Hargrove walking with Ashley [sic] Westmoreland [sic] and when we were walking behind them I noticed a glassine bag being passed from Wesmoreland — from Hargrove to Wesmoreland.” Going on, he said “ I approached them to ask them what was being passed and they said nothing at that time. I noticed by Wesmoreland’s left foot a glassine bag laying on the ground and I asked them what that was and they said they didn’t know. ’ ’
The balance of officer Filardi’s testimony was to the effect that he picked up the envelope, “ gave the two their rights and placed them under arrest. ” Additionally, this witness said that he held on to the glassine bag until he got to headquarters, where he believed he gave it to Patrolman Burnett. Filardi stated that both defendant and Westmoreland were searched at headquarters and that the latter was found to have “ an alleged joint of marijuana ” in his possession.
Following this, Patrolman Burnett gave testimony before the Grand Jury regarding the events of ithe evening of May 29,1974, in West Post Road area of White Plains. Referring to himself and officer Filardi, he said that “at that particular time we were searching the back or looking in the back alleys of Chime’s Diner and upon coming out onto the sidewalk we observed two subjects. My partner observed something suspicious and then at the time he and I both went over to the individuals. ” (Emphasis added.)
Continuing, Burnett said that the individuals were defendant and another called Westmoreland whose first name he had forgotten ; that Filardi instructed him to watch this pair; that, while watching them, he “ saw from the right hand side of Wesmoreland [sid] a glasseine [sic] bag fall to the ground.”
Of significance to us, is the fact that Patrolman Burnett,' in seeming circumspection, gave no testimony about his own observation of the purported passage of the glassine bag from defen *323 dant to Westmoreland, nor did he make any mention of; a search of these men at any time.
It would appear that Patrolman Burnett was willing to rehabilitate officer Filardi’s preliminary hearing statement regarding Westmoreland’s dropping ,of the ib.ag, but that he would not go so far as to corroborate his partner’s story about defendant’s role in the alleged bag-passing sequence.
Other testimony by Patrolman Burnett and a Detective Repp seems to establish the chain -of evidence tracing the glassine bag from Westmoreland, although not from defendant, to officer Filardi, to the Westchester County laboratory and back again to the White Plains police.
With one exception, defendant Hargrove gave the Grand Jury an account of his encounter with the police on the evening of May 29, 1974, and of his eventual arrest on the following day, which essentially matches the version given in his moving- affidavit here. The exception involves a claim on his part that, after he and his companion Westmoreland were stopped on the street, subjected to a search then and there which yielded a glassine envelope found among Westmoreland’s possessions, and were taken to police headquarters and strip searched, the police, in the space of about an hour and -one half, went out and picked up defendant’s automobile and brought it back to the station, where they searched the car, presumably without a warrant, and without avail, before they released him.
Faith Clymer, a female acquaintance of Hargrove, waived immunity and testified before the Grand Jury in his behalf. This witness stated that she was standing in front of Chime’s Diner on Post Road -on the night -of May -29, 1974, when she saw two officers approach Hargrove and another man who was unknown to her. From a vantage point of five or six feet, the Clymer woman testified that, in her hearing, the officers ‘ ‘ asked the other guy to empty ,out his pockets that they wanted to search him and then, you know, I stopped, which they stopped and the guy, he went in his pocket and he pulled out everything he had, whatever he had fell. Something fell and that’s when the officer had ibent down, picked it up and he arrested them and I didn’t see no more than that. After that I left.” Beyond this, the witness also testified that she never saw Hargrove pass anything to Westmoreland. Thus, her testimony corroborated Hargrove’s particularly as to the street search and Westmoreland’s possession of the contraband, and contradicted that of officer Filardi.
*324 Standing by itself, unexplained and uncontradicted, the proof which the District Attorney put before the Grand Jury through the police witnesses, was, although meager, legally sufficient to sustain the indictment here. (Cf. People v. Eckert, 2 N Y 2d 126; People v. Howell, 3 A D 2d 153, 161-162; People v. Connelly, 35 N Y 2d 171.)
However, the court cannot overlook the fact that there are gross and obvious inconsistencies between the evidence elicited from the police, and particularly officer Filardi, and that offered in defendant Hargrove’s behalf. While it may be accurately said that defendant’s own statement and that of his witness Faith Olymer tended to exculpate him, it is difficult, at least at first blush, to conclude as a matter of law that these statements amounted to exculpating explanations. Apparently, the Grand Jury did not deem the testimony of the defense witnesses worthy of belief. Absent one factor here, we would be constrained to say that the grand jurors were within their province in disbelieving those witnesses, especially the defendant, and in putting their credence in the People’s witnesses.
But it must be noted that, in the course of interrogating defendant before the Grand Jury, the prosecutor who presented this ease went into the subject of defendant’s prior convictions, quite obviously for the purpose of impeaching his credibility. This inquiry elicited detailed information regarding defendant’s ten-year-uld drug crime convictions in this State as well as even more remote, although potentially less prejudicial, convictions for other offenses in other jurisdictions. In an earlier day, impeachment of an accused by that method could hardly be faulted. (Cf. People v. Vaccarella, 257 App. Div. 461, 462-463; CPL 60.40; CPLR 4513.)
Nevertheless, times have changed, and it is well to observe that this matter was presented to the Grand Jury only two weeks after the New York Court of Appeals came down with its decision in People v. Sandoval (34 N Y 2d 371), effectively implementing the so-called Luck rule (see Luck v. United States, 348 F. 2d 763) in the State courts in New York, and thereby severely curtailing a prosecutor’s right to use prior convictions or proof of the prior commission of specific criminal, vicious or immoral acts to impeach the veracity of a defendant who elects to testify in his own defense upon the trial of a criminal action.
In Sandoval, Judge Jones, writing for a unanimous court, noted that (p. 376): “ in the fact-finding process, the function, in cross-examination, of evidence of a defendant’s prior criminal, vicious or immoral acts (unless such evidence would be inde *325 pendently admissible to prove, an element of the crime charged) is solely to impeach his credibility as a witness. ” Going on, he commented that, “from the standpoint of the prosecution, then, the evidence should be admitted if it will have material probative value on the issue of defendant’s credibility, veracity or honesty on the witness stand. From the standpoint of the defendant it should not be admitted unless it will have probative worth, or, even though it has such worth, if to lay it before the jury or court would otherwise be so highly prejudicial as to call for its exclusion. ” (Emphasis added.)
Approving a procedure which allows a defendant in a criminal case the opportunity to apply to the trial court ‘ ‘ to obtain a prospective ruling as to the permissible scope of his cross-examination concerning prior commission of specific criminal, vicious or immoral acts, on the basis of which, inter alia, he will decide whether to take the witness stand in his own defense ”, Judge Jones remarked that, ‘ ‘ in weighing prejudice to the defendant’s right to a fair trial, an important consideration may be the effect on the validity of the fact-finding process if the defendant does not testify out of fear of the impact of the impeachment testimony for reasons other than its direct effect on his credibility — as where the defendant would be the only available source of material testimony in support of his defense. ” {Id., pp. 373, 378; emphasis added.)
In prescribing standards for use by Trial Judges in determinaing the prejudicial effect of possible impeachment testimony, Judge Jones made two particular points which are especially pertinent here. Firstly, referring to the requirement that past conduct and the circumstances in which it occurred must have a logical and reasonable bearing on ¡the issue of credibility, and, having stale convictions or acts in mind, he noted that “lapse of time # * * will affect the materiality if not the relevance of previous conduct.” {Id., p. 376.)
Secondly, referring to past criminal conduct which closely resembles a charge currently preferred, and having drug offenses in mind, Judge Jones opined that “ cross-examination with respect to crimes or conduct similar to that of which the defendant is charged may be highly prejudicial, in view of the risk, despite the most clear and forceful limiting instructions to the contrary, that the evidence will be taken as some proof of the commission of the crime charged rather than be reserved solely to the issue of credibility. Thus, in the prosecution of drug charges, interrogation as to prior narcotics convictions (unless proof thereof is independently admissible) may present a *326 special risk of impermissible prejudice because of the widely accepted belief that persons prevously convicted of narcotics offenses are likely to be habitual offenders (United States v. Puco, 453 F. 2d, at p. 542, n. 9). ” {Id., pp. 377->378; emphasis added.)
If the lessons of Sa/ndoval are applied to the matter at har, it is evident, that whatever exculpatory effect defendant’s testimony might have had on the grand jurors-was at least neutralized, if not utterly destroyed, by the impeachment evidence which was introduced by the prosecutor. 'The irony of it is that, under the doctrine of Scmdoval, this selfsafne impeachment proof could not be admitted upon the trial of this cause without , commission of reversible error, if the defense made proper application tó. have it excluded. Gan it be, then, that such inflammatory proof . has less prejudicial impact upon a Grand Jury than it would upon a trial jury® It goes without saying that this question must be answered in the negative, for to state such a proposition is to confute it.
Under this common-law system of ours, it is judicial precedents, like Scmdoval, which interpret, shape .and refine legal principles and rules to make them fit changing circumstances and conditions. It was a need to reduce the potential of prejudice to a defendant’s right to a fair trial, created by the tendency of prosecutors to cross-examine a defendant as to previous criminal convictions and acts, not ¡to discredit veracity, but tp show propensity to commit the crime for which he. is on trial,,which led the ¡Oourt of Appeals, in Sandoval, to put a curb on the evidentiary rule which generally allows impeachment of credibility by proof of such past misconduct. Can it be 'that the protection afforded by Sandoval may be extended only to a defendant who takes the stand at trial, and that it may not be applied by analogy to shelter an accused who volunteers, to testify in his own behalf before a Grand Jury? We think not.
To so limit the holding in Sandoval would be to countenance the imposition of a double standard of evidentiary policy governing the admissibility- of proof of prior convictions and acts of misconduct ¡to attack the credibility of an accused who elects to testify in his own behalf. One rule would apply to an accused who appears before a Grand Jury and would allow the prosecution boundless latitude in the use of this tool of impeachment, regardless of the prejudice which might ensue. The other, applicable to the accused who takes -the stand at trial before a petit jury, would provide the near ultimate in safeguards against the prejudicial use of the same procedural device. To our way *327 of thinking, there is no legal justification or rational basis for such disparate treatment for witnesses who otherwise are .so similarly situated.
More importantly, to permit such an unfair rule to obtain in the conduct of a Grand Jury proceeding would be to ignore the principles upon which the grand jury system was founded and to impair the integrity of the Grand Jury process.
“The grand jury had its origin at a time when there raged a fierce conflict between the rights of the subject and the power of the crown. It was established to secure to the subject a right to appeal to his peers, under the immunity of secrecy and irresponsibility, before the government could bring him to trial. It was a right wrung from the government to secure the subject against oppression.
“ The principles of secrecy and irresponsibility were incorporated into the system at the instance, and for the protection, of the subject.
‘ ‘ The constitution of the United States, and the constitution of all the states, show that it is adopted here as a means of protection to the citizens, as well as a necessary aid to public justice. The statutes of this state are full and explicit in defining the rights of citizens, .and of the people, and the functions of the grand jury, and are entirely consistent with the principle before stated. ” (People v. Naughton, 7 Abb. Prac. [N. S.] 421, 426-427; 38 How. Prac. 430, 437—438; emphasis added.)
“ Courts have a particular responsibility to prevent unfairness in Grand Jury proceedings, for the Grand Jury is an 1 arm of the court’ (see e. g., Matter of Spector v. Allen, 281 N. Y. 251, 260; People v. Pisanti, 179 Misc. 308, 309). ” (People v. Ianniello, 21 N Y 2d 418, 424; People v. Naughton, supra; Matter of Gardiner, 31 Misc. 364, 368-370.)
This court heeds that responsibility, by concluding that the indictment against defendant cannot be permitted to stand.
Our view of the testimony before the Grand Jury reveals that the proceeding before that body was reduced to a credibility match. Thus, there was an obvious need for the grand jurors to hear defendant’s story. When defendant took the stand in response to this need, he was confronted with his criminal record which was inadmissible by reason of the holding in Sandoval.
The prosecutor knowingly and deliberately put this incitive material before the Grand Jury in violation .of the reason and spirit of the Sandoval doctrine and that of its predecessors, Luck (348 F. 2d 163, supra), Gordon (Gordon v. United States, 383 F. 2d 936), Palumbo (United States v. Palumbo, 401 F. 2d *328 270), Puco (United States v. Puco, 453 F. 2d 539), and Duffy (People v. Duffy, 44 A D 2d 298).
Not only was this evidence objectionable, it was plainly prejudicial. It was manifestly employed to overcome the inference of innocence which the Grand Jury might have drawn from the proof offered in defendant’s behalf. In other words, this highly suggestive impeachment testimony was used against defendant substantively, in an effort to convince the Grand Jury of his guilt. The reception of this evidence furnishes a ground for dismissal of the indictment. (Cf. People v. Rodrigues, 28 Misc 2d 310, 319; People v. Nicosia, 164 Misc. 152, 157; People v. Acritelli, 57 Misc. 574, 604.)
To boot, there is nothing in the Grand Jury minutes which would make it possible to say that this improper and prejudicial proof did not influence the return of this indictment. The record is devoid of any instructions by the prosecutor to the jurors to the effect that the evidence of defendant’s prior convictions was admitted solely for the purpose of demonstrating his testimonial untrustworthiness and that it could not be utilized as substantive proof. To say the least, the prosecutor had a duty to give such limiting instructions. (¡CPL 190.30, subds. 3, 4.) Nothing is to be gained by speculating as to whether the instructions were given ,but not recorded. They are missing from the record and, in this case, that renders the grand jury proceeding defective within the meaning of CPL .210.35, since there is strong possibility that the accused was prejudiced iby the omission. This furnishes an additional ground for dismissal of the indictment. (Cf. People v. Percy, 45 A D 2d 284; see, also, People v. Benin, 186 Misc. 548.)
Accordingly, the indictment is dismissed, defendant is discharged, and his bail exonerated. In view of this disposition, the remaining relief sought by defendant is denied. It should be noted, however, that had we not dismissed the presentment here upon the bases which we did, we would have quashed it in the furtherance of justice. In addition to the previously recited facts which dictate such action, we have learned by independent investigation that Westmoreland, defendant’s companion and codefendant, was never indicted for his part in the transaction which gave rise to this indictment. Instead, he was charged in an information with misdemeanor possession of heroin and marijuana and was released on bail. When he failed to appear in the local court in White Plains on June 11, 1974, a bench warrant was. issued for his arrest. He is still a fugitive.
*329 The County Clerk is directed to serve, a copy of this decision and order, with notice of entry thereof, upon the District Attorney and upon defendant’s attorney.
So ordered.