LHOST, Plaintiff in error, v. STATE, Defendant in error.

Supreme Court

*No. 76–564–CR. Argued October 4, 1978.—Decided October 31, 1978.*

(Also reported in 271 N.W.2d 121.)

622

624

For the plaintiff in error the cause was argued by *Garrett N. Kavanagh,* assistant state public defender, with whom on the brief was *Howard B. Eisenberg,* state public defender.

For the defendant in error the cause was argued by *David J. Becker,* assistant attorney general, with whom on the brief was *Bronson C. La Follette,* attorney general.

COFFEY, J.   There are two issues presented on appeal:

1.  Was the evidence sufficient to sustain a verdict of guilty to the crime of attempted rape?

2.  Did the trial court err in refusing to admit the results of polygraph test favorable to the defendant because the prosecution refused to stipulate?

The defense has alleged that the evidence is not sufficient to meet the statutory elements of attempted rape. Attempted rape is defined by sec. 944.01, Stats.[1] 1973

[1] Sec. 944.01 was repealed by Laws of 1975, ch. 184, sec. 7 effective March 27, 1976 and the crime of rape is now treated by sec. 940.225, Stats., as a sexual assault.

and sec. 939.32(2), Stats. 1973. The statutes read as follows:

"944.01 **Rape.** (1) Any male who has sexual intercourse with a female he knows is not his wife, by force and against her will, may be imprisoned not more than 30 years.

"(2) In this section the phrase 'by force and against her will' means either that her utmost resistance is overcome or prevented by physical violence or that her will to resist is overcome by threats of imminent physical violence likely to cause great bodily harm."

"Sec. 939.32 **Attempt.** . . . (2) An attempt to commit a crime requires that the actor have an intent to perform acts and attain a result which, if accomplished, would constitute such crime and that he does acts toward the commission of the crime which demonstrate unequivocally, under all the circumstances, that he formed that intent and would commit the crime except for the intervention of another person or some other extraneous factor."

In *Oakley v. State,* 22 Wis.2d 298, 125 N.W.2d 657 (1964), this court analyzed the two statutory requirements of intent and overt acts which must occur together in order to have an attempted rape:

"(1) The male must have the intent to act so as to have intercourse with the female by overcoming or preventing her utmost resistance by physical violence, or overcoming her will to resist by the use of threats of imminent physical violence likely to cause great bodily harm; (2) the male must act toward the commission of the rape by overt acts which demonstrate unequivocally, under all the circumstances, that he formed the intent to rape and would have committed the rape except for the intervention of another person or some other extraneous factor." *Supra* at 306.

The rule for the sufficiency of the evidence upon appellate review of a criminal action is also well stated:

" 'While the state must prove defendant's guilt beyond a reasonable doubt, on appeal this court's review is

limited to determining whether the evidence adduced, believed and rationally considered by a jury was sufficient to prove defendant's guilt beyond a reasonable doubt. Reversal is required only when the evidence considered most favorably to the state and the conviction is so insufficient in probative value and force that it can be said as a matter of law that no trier of facts acting reasonably could be convinced to that degree of certitude which the law defines as beyond a reasonable doubt.'" *State ex rel. Kanieski v. Gagnon,* 54 Wis.2d 108, 113, 194 N.W.2d 808 (1972); *Gilbertson v. State,* 69 Wis.2d 587, 593, 230 N.W.2d 874 (1975); *See also Jaworski v. State,* 74 Wis.2d 134, 138, 246 N.W.2d 137 (1976) (an attempted rape case, reversed on other grounds).

The defendant alleges that the evidence does not establish beyond a reasonable doubt that the defendant intended to have sexual intercourse with the victim by force overcoming her utmost resistance or that her will was overcome by threats of imminent physical harm likely to cause great bodily harm. The defense emphasizes that the element of "utmost resistance" was missing. The state refutes this argument. They stress that the overt acts of the defendant manifest an intent to use whatever force necessary to have sexual intercourse with the victim, and that given the victim's age, experience and circumstance "utmost resistance" was offered by the victim in attempting to repel the attack.

A review of the evidence mandates a conclusion in agreement with the state's position that the evidence is sufficient to prove the elements of attempted rape.

It has been stated in the consideration of an attempted rape case that intent will be inferred from the overt acts of the accused. *LeBarron v. State,* 32 Wis.2d 294, 298, 299, 145 N.W.2d 79 (1966). The overt acts in this case are that:

1. The defendant removed the victim's slacks after she refused to do so by his request; she stated "never" in response to this request.

2. That he had dropped his pants to his knees.

3. That despite finding the victim's legs clenched in a crossed position, he persisted in trying to spread her legs.

4. When the victim tried to push the defendant off her body, he forcibly held her hands down and pressed on with his attack.

5. That when the victim broke free from his hold she started beating his back and grabbed his neck, at which time he stuck two fingers in the victim's private parts and told her to spread her legs as he was going to get her "no matter what."

6. That he slapped the victim and left the house after the victim screamed and the baby in the nearby crib began to cry.

This case is factually similar to *Adams v. State*, 57 Wis.2d 515, 204 N.W.2d 657 (1973) where the following facts were found sufficient to establish the statutory elements of attempted rape:

"(1) His statement to complainant as he threw her on the floor, 'I don't really want the room, I want you because I never had a white woman before;' (2) his forcibly pulling complainant's shorts and undergarments to her knees; (3) his insertion of a finger into complainant's vagina; (4) his threat to the child in the event complainant should cry out; (5) his renewed struggle after throwing the child onto a couch; and (6) his belt buckle being undone." *Supra* at 519.

In *Adams*, the assailant's intent to use force to overcome the victim's resistance was found from these same overt acts. *Supra* at 519–22.

The facts in this case create a reasonable inference that the defendant intended to have sexual intercourse with the victim and that he would use force to accomplish the same. The defense offers *Oakley v. State* in support of its position wherein the supreme court found that the

elements of attempted rape had not been met when an assailant desisted when told by the victim she was menstruating. This case and *Oakley* are distinguishable. In *Oakley* the defendant did not pursue the removal of the woman's blouse or skirt when she pushed his hand away; nor was she required to offer any more retaliatory resistance than merely pushing his hand away. In the instant case the defendant asked her to remove her pants. The victim replied "never" and so the defendant removed them; the lack of resistance on the victim's part is not persuasive under the totality of the circumstances test as manifested by the defendant's overt acts. Further, in this case as in *Adams,* the defendant used physical force in restraining her resistance as he continued to try and spread the 14 year old child's crossed legs. The defendant's alleged statement that he was going to get the victim "no matter what" indicates his willingness to use force to accomplish sexual intercourse with the child. As was noted in *Skulhus v. State,* 159 Wis. 475, 479, 150 N.W. 503 (1915), the fact that the defendant terminated his attack at the victim's first outcry is not sufficient evidence to create a reasonable doubt as to the attacker's intent.

As to the question of "utmost resistance," this court has held that this is a relative term, subjectively tested. *State v. Herfel,* 49 Wis.2d 513, 518, 182 N.W.2d 232 (1971) ; *Madison v. State,* 61 Wis. 2d 333, 336, 212 N.W. 2d 150 (1973). The age, experience and physical attributes of the victim must be considered in determining the legal question of "utmost resistance." Further, in offering "utmost resistance" the victim is not required to do the useless. *State v. Schmear,* 28 Wis. 2d 126, 130, 135 N.W.2d 842 (1965). Also, in the consideration of resistance offered by a victim, consent or acquiescence does not arise from a victim's conduct that seeks to pro-

tect third parties such as sleeping children. *Madison v. State, supra* at 337.

In a factual review of this case to find a reasonable inference which supports that "utmost resistance" was offered, the following facts can be considered:

1. When requested to remove her slacks, the 14 year old child victim replied "never."

2. The testimony of victim that she was "scared to death" and thought the defendant was there to "have some kicks and just kill us or something."

3. That "us" refers to the sleeping child for whom the victim was babysitting.

4. The age, experience and physical attributes of the victim: she was 14, 5' 4" in height and weighed 119 pounds; the attacker was described as 5' 9" in height and 170–175 in weight.

5. That when she broke free from his hold she started pounding his back with her fists and grabbed his neck.

6. That she screamed when his fingers entered her genital area.

A victim's yielding through "fear" in an attack creates no reasonable doubt as to the assailant's intent to rape the victim. The choice when made in fear to submit or to resist is a philosophical choice only and the law does not require a woman to become a martyr to test the sincerity of the imminent threat of rape manifested by an attacker's overt acts. *State v. Herfel, supra* at 518-19. The law has traditionally recognized a difference between consent and submission. It is reasonable to believe that the defendant's threat "I am going to get you no matter what," combined with the use of force, created in the victim the utmost fear, thus minimizing her power and will to resist. In this case there were obvious elements of resistance. The victim decided in the face of her attacker's actions it was safer to submit to his ad-

'vances, but at the point when he came closest to realizing his sexual objective, she resisted. The fact that he ceased in the face of the resistance does not negate the inference that he intended to use force to have sexual relations with the victim. Resistance in and of itself can be an extraneous factor preventing the accomplished crime,[2] or a passive factor such as a crying baby can constitute the intervention of a third party. *Adams v. State, supra* at 523.

The defendant's second issue on appeal requests this court to reconsider its pronouncement in *State v. Stanislawski,* 62 Wis.2d 730, 216 N.W.2d 8 (1974).[3] *Stanis-*

[2] In *Adams, supra* at 523, the resistance was described as a "well-placed kick in the mouth."

[3] The rule stated in *Stanislawski, supra,* as to the admission of a defendant's polygraph exam results was stated at 742–43 as follows:

" '. . . to corroborate other evidence of a defendant's participation in the crime charged,' and, 'If he takes the stand such evidence is admissible to corroborate or impeach his own testimony.' The required preconditions or qualifications for the admission of such testimony, in this state as in Arizona under *Valdez,* are as follows:

"(1) That the district attorney, defendant and his counsel all sign a written stipulation providing for defendant's submission to the test and for the subsequent admission at trial of the graphs, and the examiner's opinion thereon on behalf of either defendant or the state.

"(2) That notwithstanding the stipulation the admissibility of the test results is subject to the discretion of the trial court, *i.e.,* if the trial judge is not convinced that the examiner is qualified or that the test was conducted under proper conditions he may refuse to accept such evidence.

"(3) That if the graphs and examiner's opinion are offered in evidence the opposing party shall have the right to cross-examine the examiner respecting:

"(a) the examiner's qualifications and training;

"(b) the conditions under which the test was administered;

"(c) the limitations of and possibilities for error in the technique of polygraphic interrogation; and

"(d) at the discretion of the trial court, any other matters deemed pertinent to the inquiry.

*lawski* permitted the admissibility of the results of polygraph examinations when specified conditions were fulfilled amongst which was that before any polygraph information would be admissible a written stipulation by all the parties was required. *Supra* at 742. The defendant argues that polygraph results should be admissible without stipulation and that the stipulation requirement permits a prosecutor to bar the admission of probative and relevant evidence which may be exculpatory. It is alleged the prosecutor's refusal to stipulate to exculpatory polygraph evidence is in violation of the defendant's due process right to compulsory process.

The "no stipulation" issue has been before this court on prior occasions. In *Gaddis v. State,* 63 Wis. 2d 120, 216 N.W.2d 527 (1974) the court rejected a defendant's argument that a stipulation should not be required before polygraph results are admissible. In regard to the court's reasoning it was stated in *Gaddis* at 126:

"The procedure here followed—defendant's request, the court's approval and the state crime laboratory examiner's conducting the test, under sec. 165.79, Stats.—could be viewed as an additional alternative procedure to that authorized in the *Stanislawski Case,* particularly where the defendant offered to submit to another polygraph examination administered by any examiner the prosecutor cared to designate. However, all justices agree that, having determined in *Stanislawski* the proper procedure for the admission of polygraph evidence in this state, we ought not consider additional or alternative procedures so soon after relaxing the forty-year-old total ban on such evidence. Some experience with the

"(4) That if such evidence is admitted the trial judge should instruct the jury that the examiner's testimony does not tend to prove or disprove any element of the crime with which a defendant is charged but at most tends only to indicate whether at the time of the examination defendant was telling the truth. Further, the jury members should be instructed that it is for them to determine what corroborative weight and effect such testimony should be given."

by-stipulation-only procedure should be had before additions to it should be considered."

The "no stipulation" issue again appeared in *State ex rel. Harris v. Schmidt,* 69 Wis.2d 668, 230 N.W.2d 890 (1974). In *Harris* a parole revocation hearing examiner permitted polygraph results to be received in evidence without a stipulation. This evidence was used by the examiner in assessing the parolee's credibility. The court found that it was prejudicial error to admit the test results without stipulation. *Supra* at 681. The court also considered the absence of a stipulation as controlling[4] in affirming the exclusion of a defendant's offer to take a polygraph examination. *Turner v. State,* 76 Wis.2d 1, 24, 250 N.W.2d 706 (1977).

As recently as last term the issue was raised in *Zelenka v. State,* 83 Wis.2d 601, 266 N.W.2d 279 (1978), where the defense sought the admission of a polygraph examination taken of the defendant's father. It was alleged that the father could support defense claims that the police during interrogation had acted improperly following *Zelenka's* request for counsel. The court reiterated its holding in *Gaddis v. State, supra,* that some experience was needed with the stipulation only rule before considering a change in *Stanislawski* and stated:

"We are not persuaded to change the rule of *Stanislawski* upon the experience and the arguments made to this date." *Zelenka v. State, supra* at 613.

The cases discussed above indicate a clear choice by this court not to withdraw from its position in conditioning polygraph admissiblity upon a prior stipulation.

---

[4] The court also discussed *Hemauer v. State,* 64 Wis.2d 62, 218 N.W.2d 342 (1974), which held the offer to take a polygraph may well be probative but can be excluded if its value is outweighed by the danger of unfair prejudice.

The defense maintains that the stipulation only rule of *Stanislawski* permits a condition to be created wherein the defendant's due process rights to compulsory process are violated. The stipulation only rule permits a prosecutor to withhold his agreement to the admissibility of polygraph results which may tend to reveal exculpatory evidence. The defense argues that *Washington v. Texas*, 388 U.S. 14 (1967) and *Chambers v. Mississippi*, 410 U.S. 284 (1972) prohibit such a result.

*Washington v. Texas, supra* at 19 held that the Sixth Amendment's guarantee to compulsory process is applicable to the states through the Fourteenth Amendment.[5] *Washington* further held unconstitutional a Texas rule of procedure prohibiting parties charged with the same crime from testifying for one and another's defense. The rationale was that such parties are no more prone to perjure themselves in testifying for the defense than when they might choose to make a bargain with the prosecutor and testify in the state's case.

In *Chambers v. Mississippi, supra,* the court disclaimed setting any new constitutional principles when they held a Mississippi rule that a party may not impeach his own witness was contrary to a defendant's right to compulsory process. Factually, the petitioner sought the testimony of a party who had stated on three occasions he and not the petitioner was responsible for the murder

[5] The Wisconsin Constitution, art. I, §7 is similar in providing:

"In all criminal prosecutions the accused shall enjoy the right to be heard by himself and counsel; to demand the nature and cause of the accusation against him; to meet the witnesses face to face; to have compulsory process to compel the attendance of witnesses in his behalf; and in prosecutions by indictment, or information, to a speedy public trial by an impartial jury of the county or district wherein the offense shall have been committed; which county or district shall have been previously ascertained by law."

with which the petitioner was charged. This party had also given a confession to that effect; this confession was later repudiated. The party was not called as part of the prosecution's case so the Mississippi "voucher" rule precluded the petitioner from in effect cross-examining the party as to his previous inculpatory declarations. The defendant was also prohibited by the Mississippi hearsay rule from questioning three persons to whom the third party had told of his involvement in the murder. In finding the "voucher" rule and this application of the hearsay rule unconstitutional, the court stated:

"Few rights are more fundamental than that of an accused to present witnesses in his own defense. *E.g., Webb v. Texas,* 409 U.S. 95 (1972); *Washington v. Texas,* 388 U.S. 14, 19 (1967); *In re Oliver,* 333 U.S. 257 (1948). In the exercise of this right, the accused, as is required of the State, must comply with established rules of procedure and evidence designed to assure both fairness and reliability in the ascertainment of guilt and innocence." *Chambers v. Mississippi, supra* at 302.

The defendant cites two cases which support their position that the requirement of a stipulation prior to the admissibility of polygraph evidence is constitutionally violative based upon *Washington v. Texas, supra,* and *Chambers v. Mississippi, supra.* The first is *State v. Sims,* 52 Misc. 31, 369 N.E.2d 24 (Ciyahoga Cty. Ohio 1977), wherein the court granted a convicted defendant post-conviction relief. The judgment of conviction was vacated and a new trial ordered based upon the judge's belief that the polygraph is a reliable scientific process (similar to radar, fingerprint identification, etc.) when the test is conducted according to scientific procedures. The trial judge noted that any possibility for unreliability can be checked by effective cross-examination by the prosecution, and that in the face of cross-examina-

tion there is no reasonable basis to deny the defendant favorable witnesses. Further that the testimony of the polygraph expert should be accorded no more or less standing than the testimony of any other expert witness.

Despite the exhaustive work that went into the trial court's writing of *State v. Sims, supra* (40 pages in length) we question its precedential value to this court. *Sims* was filed on April 25, 1977 and as recently as February 22, 1978 the Ohio Supreme Court reaffirmed its "stipulation only" rule. *State v. Souel,* 53 Ohio St.2d 123, 372 N.E.2d 1318.

The second case offered by the defense is *State v. Dorsey,* 87 N.M. 323, 532 P.2d 912, affd. 88 N.M. 184, 539 P.2d 204 (1975). The New Mexico Supreme Court without detailed analysis made the following findings regarding the "stipulation only" rule previously existing in New Mexico:

"(1)  Mechanistic in nature;

"(2)  Inconsistent with the concept of due process;

"(3)  Repugnant to the announced purpose and construction of the New Mexico Rules of Evidence." p. 205.

The *Dorsey* decision stressed the inconsistency of the prior stipulation requirement to the pertinent rules of evidence.[6] Ostensibly, the *Dorsey* case turned on the

---

[6] The Wisconsin counterparts are:

"901.02  **Purpose and construction.** These sections shall be construed to secure fairness in administration, elimination of unjustifiable expense and delay, and promotion of growth and development of the law of evidence to the end that the truth may be ascertained and proceedings justly determined."

"907.02  **Testimony by experts.** If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise."

"904.02.  **Relevant evidence generally admissible: irrelevant evidence inadmissible.** All relevant evidence is admissible, except

New Mexico court's perception that, given the appropriate foundation by a qualified polygrapher that strict scientific methods had been followed in administering the test, the polygraph is an accurate and reliable device warranting admissibility limited only by the necessity for foundation testimony.[7]

*Washington v. Texas, supra,* and *Chambers v. Mississippi, supra,* do not stand for the proposition that inherently unreliable evidence or evidence of questionable validity must be admitted into evidence as part of the defendant's right to compulsory process. In fact, to the contrary, in each case the court undertook an analysis to establish the reliability of the excluded testimony and then weigh the reliability and necessity for such evidence against the state's interest in its exclusion. *Washington* and *Chambers* do not mandate the admissibility of polygraph results without stipulation if this court finds

as otherwise provided by the Constitutions of the United States and the State of Wisconsin, by statute, by these rules, or by other rules adopted by the Supreme Court. Evidence which is not relevant is not admissible."

[7] It should be noted that to this date no state has fully followed the *State v. Dorsey* rationale: Wyoming; *Cullin v. State,* 565 P. 2d 445 (Wyo. 1977) the *Dorsey* rationale was curiously used to support a "stipulation only" rule abandoning Wyoming's previous total exclusion policy. Arizona; *State v. Molina,* 117 Ariz. 454, 573 P.2d 528. Two members of this court in a concurring opinion suggested it was time to re-examine the stipulation condition to admissiblity in light of *Dorsey. Note:* Arizona had explicitly rejected *Dorsey* in *State v. Treadway,* 116 Ariz. 163 568 P.2d 1067 (1977). States have expressly rejected Dorsey: Washington; *State v. Young,* 89 Wash.2d 613, 574 P.2d 1171 (1978). Additionally, this court rejected the applicability of *Brady v. Maryland,* 373 U.S. 83 (1962) and *Chambers v. Mississippi, supra* upon reasoning that there is no withholding of exculpatory evidence when the polygraph exam is defense initiated. Prosecutorial refusal to stipulate is not a parallel to the refusal to disclose exculpatory evidence. Iowa: *State v. Conner,* 241 N.W.2d 447 (Ia. 1876).

the polygraph is not sufficiently reliable in the absence of a stipulation. The issue of the admissibility of an exculpatory polygraph examination without stipulation came before the U.S. Supreme Court last term. Certiorari was denied in *Masri v. United States,* 434 U.S. 907 (1977), previously reported in 547 F.2d 932 (5th Cir. 1977). This denial of certiorari upheld the Fifth Circuit's complete bar as to polygraph results.[8]

Empirical data has not been supplied to establish the reliability of polygraph exams since *State v. Stanislawski, supra; Gaddis v. State, supra,* and this court's most recent pronouncement in *Zelenka v. State, supra.* To this date only a limited number of courts do not require a stipulation prior to the admissibility of polygraph results.[9] The majority of courts still require a stipulation

[8] From the U.S. Supreme Court's consistent refusal to grant certiorari to cases involving polygraph challenges, the Court appears to be taking a position that permits each circuit to determine the requirements for the admission or exclusion of polygraph test results.

Cases denying admissibility; Second Circuit: *United States v. Bando,* 244 F.2d 833, 841, *cert. den.,* 355 U.S. 844 (1957); Fifth Circuit: *United States v. Cochran,* 499 F.2d 380, 393 (1974), *cert. den.* 419 U.S. 1124 (1975). Cases permitting admissibility; Sixth Circuit: *United States v. Mayes,* 512 F.2d 637, 648 n. 6, *cert. den.* 422 U.S. 1008 (1975); Seventh Circuit: *United States v. Infelice,* 506 F.2d 1358, 1365 (1974) *cert. den.* 419 U.S. 1107 (1975); Ninth Circuit: *United States v. Marshall,* 526 F.2d 1349, 1360 (1975), *cert. den.* 426 U.S. 923 (1976); *United States v. DeBetham,* 470 F.2d 1367, 1368 (1972), *cert. den.* 412 U.S. 907 (1973); Tenth Circuit: *United States v. Russo,* 527 F.2d 1051, 1058–59 (1975), *cert. den.* 426 U.S. 906 (1976); *United States v. Rogers,* 419 F.2d 1315, 1319 (1969); *United States v. Wainwright,* 413 F.2d 796, 802–03 (1969), *cert. den.* 396 U.S. 1009 (1970).

[9] Cases in which courts have departed from the traditional rule include: *United States v. Ridling,* 350 F. Supp. 90 (E.D. Mich. 1972); *United States v. Zeiger,* 350 F. Supp. 685 (D.C.D.C. 1972); revd. w.o. opin. 156 U.S. App. D.C. 11, 475 F.2d 1280 (1972); *Commonwealth v. A Juvenile,* 365 Mass. 421, 313 N.E.2d 120 (Mass. 1974); *State v. Dorsey, supra; Walther v. O'Connell,* 72

prior to admissibility.[10] Further, at least one court has for all criminal matters withdrawn its stipulation rule and has reverted to a complete exclusion policy under any circucstances. *Fulton v. State,* 541 P.2d 871 (Okla. Crim. Ct. of App. 1975).[11]

The results of authoritative studies are in as sharp dispute today as they were when *Stanislawski* was

Misc.2d 316, 339 N.Y.S.2d 386 (1972) (civil case). *See also United States v. DeBetham,* 348 F. Supp. 1377 (S.D. Cal. 1972), *affd,* 470 F.2d 1367 (9 Cir. 1972), *cert. denied,* 412 U.S. 907, 93 S. Ct. 2299, 36 L. Ed.2d 972 (1973). Courts which have held the evidence admissible have prescribed stringent, carefully-circumscribed conditions and limitations. *United States v. Mayes,* 512 F.2d 637 (CA 6 1975), *cert. denied,* 422 U.S. 1008 (1975); *United States v. Infelice,* 506 F.2d 1358 (CA 7 1974), *cert. denied,* 419 U.S. 1107 (1975). *United States v. Oliver,* 525 F.2d 731 (CA 8 1975). There the trial judge may admit such evidence offered by the defense without an objection by the government.

[10] *See e.g., State v. Seebold,* 111 Ariz. 423, 531 P.2d 1130, 1132 (1975); *People v. Reeder,* 65 Cal. App.3d 235, 135 Cal. Rptr. 421, 422–423 (1976); *Cumbie v. State,* 327 So.2d 67, 68 (Fla. App. 1976); *People v. Oswalt,* 26 Ill. App.3d 224, 324 N.E.2d 666, 667 (1975); *Banks v. State,* 351 N.E.2d 4, 10 (Ind. 1976); *State v. Conner,* 241 N.W.2d 447, 456–460 (Ia. 1976); *State v. Lassley,* 218 Kan. 758, 545 P.2d 383, 385 (1976); *Smith v. State,* 20 Md. App. 577, 318 A.2d 568, 579 (1974); *People v. Levelston,* 54 Mich. App. 477, 221 N.W.2d 235, 236–237 (1974); *Harrison v. State,* 307 So.2d 557, 562 (Miss. 1975); *State v. Roberts,* 547 S.W.2d 500, 501 (Mo. 1977); *State v. Steinmark,* 195 Neb. 545, 239 N.W.2d 495, 497 (1976); *Warden, Nev. State Prison v. Lischko,* 523 P.2d 6, 8 (Nev. 1974); *People v. Hargrove,* 80 Misc.2d 317, 363 N.Y.S.2d 241, 245 (1975); *State v. Jackson,* 287 N.C. 470, 215 S.E.2d 123, 129–130 (1975); *State v. Green,* 531 P.2d 245, 252 (Or. 1975); *State v. Young,* 87 Wash.2d 129, 550 P.2d 1, 3 (1976).

[11] *Supra* at 872 it was stated: "However, in light of the potential unreliability of polygraph examinations at this time, we feel that in all future cases the introduction into evidence of polygraph examination results for any purpose, even if admitted upon stipulation of all the parties, will be error." This court found a 75 percent reliability factor not sufficient for admission even by stipulation.

written in 1974.[12] In *Stanislawski* at 738 a footnote reviewed the divergent results in polygraph studies:

"Estimates of accuracy: 94 percent accurate, 5 percent inconclusive, 1 percent known errors—J. Reid & F. Inbau, *Truth and Deception: The Polygraph ("Lie Detector") Technique, supra,* footnote 9, at 234, 235; 87.75 percent accurate—F. Horvath & J. Reid, *The Reliability of Polygraph Examiner Diagnosis of Truth and Deception,* 62 Journal of Criminal Law, Criminology and Police Science (1971), 276, 278, 279; 96 percent accurate, 3 percent inconclusive, 1 percent maximum known error—R. Pfaff, *The Polygraph: An Invaluable Judicial Aid,* 50 A.B.A.J. (1964), 1130, 1132, citing Arther and Caputo, *Interrogation for Investigators* (1959) 214; 2 to 5 percent error—W. Wicker, *The Polygraphic Truth Test and the Law of Evidence, supra* (1953) footnote 9, 711, 713; 2 to 3 percent known error—E. Levitt, *Scientific Evaluation of the "Lie-Detector,"* 40 Iowa L. Rev. (1955), 440, 450; 75 to 80 percent accurate, 15 to 20 percent inconclusive, 5 percent error—Note, *The Polygraph and Probation,* 9 Idaho L. Rev. (1972), 75, 76; 80 percent accurate, 17 percent inconclusive, 3 percent error—E. Cureton, *A Consensus as to the Validity of Polygraph Procedures,* 22 Tenn. L. Rev. (1953), 728, 729. *But see:* As high as 25 percent error—S. Highleyman, *The Deceptive Certainty of the "Lie Detector," supra* (1958–1959), footnote 9, at 47, 62; 70 percent accurate—L. Burkey, *The Case Against the Polygraph,* 51 A.B.A.J. (1965), 855, 856."

Authorities have noted that such statistical surveys do not recognize an inherent bias in the data collection process; that being there is no conceivable way in which to verify the test accuracy of the responsible party or

[12] The expert in this case on appeal, Joseph Wilimovsky, stated in the offer of proof that there is a 96% accuracy rate and the 4% margin remaining was not a case of inaccuracy but of inconclusive results.

Contrary: Kubis "Comparison of Voice Analysis and Polygraph as Lie Detector Procedures" 3 Polygraph 1, 39 (1974) where under laboratory conditions the accuracy rate was 76%.

test subject unless a confession results. Abbell, "Polygraph Evidence: The Case Against Admissibility in Federal Criminal Trials," 15 *Am. Crim. L. Rev.* 29, 35.

One of the most cogent studies was done by Dr. Martin Orne in his article, "Implications of Laboratory Research for the Detection of Deception," 2 Polygraph 169 (1973). In addressing the problems to the accuracy of lie detector results when a stipulation is required for admissibility and the test is taken prior to stipulation at the behest of defense counsel, he makes the following points:

"Whereas the usual polygraph examination is carried out in a situation where the polygrapher is at arm's length—in the employ of a law enforcement agency, a potential (or actual) employer or in some similar relationship, where his decision would inevitably have a direct effect on a suspect's future—the context in which the friendly polygrapher carries out his test is inevitably different. In the latter case the suspect realizes that his attorney has employed the polygraph examiner to help in the preparation of his defense. For the innocent person this may matter relatively little; however, for the guilty individual it alters the situation considerably. The guilty individual when tested by a friendly polygrapher knows that the results of the test *if he is found deceptive* will not be used against him. The only kind of findings which his attorney would utilize are ones where his innocence is being corroborated by the polygraph. As a consequence, the client's fears about being detected are greatly reduced. As we have been able to show in the laboratory, and as is acknowledged by all polygraph experts, *a suspect's fear of detection is the major factor in assuring his augmented physiological response while lying. It is precisely this aspect of the situation which is most dramatically altered when the polygraph is employed by the defendant's attorney. The respect and perhaps even deference accorded to the client by the polygraph examiner will tend to convince the client that the polygrapher is really attempting to help his cause and thereby make him less afraid and less de-*

*tectible, even if he is guilty."* pp. 194–195. (Emphasis supplied.) [13]

In conclusion Dr. Orne suggests that polygraphers should refrain from testing defendants when there is an absence of meaningful consequences if he is found deceptive. *Supra* at 195. [14]

In determining the reliability or unreliability of an unstipulated polygraph taken at the request of defense counsel a review of the facts in the instant case will be instructive. The evidence inculpating the defendant is:

1. The victim was able to record a matched license plate number and make a reasonably accurate identification of defendant's car.

2. The victim was able to pick the defendant out of a group of 5 photographs on the night of the incident, and made an in-court identification.

3. The victim was able to make a positive identification of the key chain and barrette found in defendant's car as the ones in her slacks the night of the incident. The fact that the key belonged to the victim was verified

[13] *See United States v. Urquidez,* 356 F. Supp. 1363, 1366–67 (D.C.C.D. Cal. 1973) for factors affecting polygraph accuracy, *i.e.,* the motivation of the subject; fear of being detected; the subject's physical and mental condition; the competence, integrity and attitude of the operator; the wording of the relevant questions; the appropriateness of the control question; the reading of graphs.

[14] This article was discussed in length in *People v. Adams,* 53 Cal. App.3d 109, 125 Cal. Rptr. 518, 520–21 (1975), wherein it was held that where a unilateral polygraph exam has been administered the reliability of any future tests, even if under stipulation, would be so diminished that the results of the subsequent tests should not be considered as evidence. *Supra* at 524. This rule was developed to stop the practice of "examiner shopping." The more times a subject takes a polygraph test the greater likelihood is that he will become immune or habituated to the machine's processes. Abbell, *supra* at 46, 47; *United States v. Urquidez, supra* at 1366.

by the police by opening the door to her house with the key.

4. There was testimony by an expert that hair samples matched those of a class of hair characteristics to which the defendant belongs.

Despite this proof, the defendant was able to pass a defense initiated polygraph exam. The disparity between traditional forms of evidence based upon perception and knowledge and the polygraph evidence, an arguable form of expert opinion, does damage to the arguments of those who contend the unstipulated polygraph exam bears accurate and reliable results. Further, we reject the argument that polygraph examination results are as equally reliable as forensic tests such as ballistic evidence, blood tests and fingerprint identification.[15]

We find several objective and subjective factors which distinguish the polygraph exam from forensic testing.[16] The objective factors are: (1) there is no one physiological reaction that is unique and indicative of deception; (2) deception may be indicated by other factors such as a "neurotic interconnection" to the question asked; (3) socio-economic or cultural factors may eliminate from the subject any moral apprehensions about being deceptive; (4) the ability of subjects to produce muscle tension and mental imagery to "beat the machine"; (5) subjects are not proper for polygraph examination if mentally unstable, on depressant drugs or become overly tired if subjected to lengthy interrogation prior to exam. All of the above factors tend to minimize the subject's autonomic responses; (6) that physical surroundings will affect the responses of the subject, *i.e.*, noises, number of people in the examining

[15] *Sims v. State, supra; United States v. Ridling, supra.*

[16] Abbell, *supra*, 36–41 gives a detailed analysis of the following objective and subjective factors.

area, length of the test and pre-test interview; (7) framing of questions as to specificity and complexity; the complete knowledge of the examiner is required so questions can be adequately framed. If a defense examiner is without the benefit of police investigation he is not asking questions with full knowledge. The subjective factors are: (1) recommended procedure requires an examiner to observe the subject's behavior during the exam, therefore chart readings may be biased by an examiner's perception as to the subject's behavior; (2) the "hostile" or to the contrary, the "friendly" examiner's psychological interaction with the subject may affect results; (3) lack of predictability to polygraph charts. No two examiners will read polygraph charts in the same manner consistently.[17]

We therefore come to the conclusion that unstipulated polygraph exams are not sufficiently accurate and reliable so as to mandate the abandonment of our holding in *Stanislawski*. A defendant's right to compulsory process does not encompass the right to introduce unreliable evidence which overrides "established rules of procedure and evidence designed to assure both fairness and reliability in the ascertainment of guilt or innocence." *Chambers v. Mississippi, supra* at 302; *State v.*

---

[17] *See:* Hunter & Ash, "The Accuracy and Consistency of Polygraph Examiners' Diagnoses," 1 *Jour. of Police Science and Administration,* 370 (1973) which describes the giving of twenty polygraph charts to seven experienced polygraphers. Three months later the same twenty charts were given to these experts. The results were stated as follows: "Agreement between the two judgments made by the same examiner at different times was high—an average 85% consistency (occasion to occasion agreement) for the seven examiners. The consistency of the individual examiners involved ranged from a low of 75% to a high of 90%." *Supra* at 372. *See also: State v. Mendoza,* 80 Wis.2d 122, 185, 250 N.W.2d 260 (1977) where "battle of the experts" ensued over contrary readings of polygraph charts.

*Conner, supra* at 458. The Wisconsin stipulation rule pronounced in *Stanislawski* is designed to assure the fairness and reliability in the introduction of polygraph results in evidence. As was stated by the Iowa Supreme Court, a stipulation is tantamount to the evidentiary waiver of objection:

"Defendant's third ground for challenging the trial court's ruling excluding the polygraph evidence is based on the alleged inequity of admitting stipulated evidence and excluding unstipulated evidence. This argument misconceives the basis for admitting the evidence pursuant to stipulation. When a party who otherwise has a right to object to the admissibility of evidence consents to the admission of the evidence, he gives up his right to object. This is the principle under which stipulated polygraph evidence is received. [Citations omitted.]

"An objection is a means of invoking a rule of evidence by which admission of proof at trial is regulated. [Citation omitted.] In our adversary system, evidence received without objection is in the case for what it is worth. This is no less true when an objection is stipulated away than when it is otherwise given up. Contrary to defendant's argument, the issue of admissibility of polygraph evidence is no more in the hands of the adversary than is the issue of admissibility of any evidence to which an adversary may lodge a valid objection. We find no merit in this ground." *State v. Conner, supra* at 459.

In fact, the agreement to stipulate to the admissibility of polygraph results may also be a waiver of a jury determination of credibility[18] and a waiver of cross-examination.[19]

---

[18] In *United States v. Alexander*, 526 F.2d 161 (8th Cir. 1975), the effect on the jury of polygraph admission was noted at 168:

"When polygraph evidence is offered in evidence at trial, it is likely to be shrouded with an aura of near infallibility, akin to the ancient oracle of Delphi. During the course of laying the

Proponents of the unstipulated polygraph exam equate its use with that of the expert testimony of a psychiatrist, but the same proponents fail to take into consideration that many experienced trial judges and scientific writers of renown question the role of medical testimony of a psychiatric nature and polygraph examiners in our

evidentiary foundation at trial, the polygraphist will present his own assessment of the test's reliability which will generally be well in excess of 90 percent. He will also present physical evidence, in the form of the polygram, to enable him to advert the jury's attention to various recorded physiological responses which tend to support his conclusion. Based upon the presentment of this particular form of scientific evidence, present day jurors, despite their sophistication and increased educational levels and intellectual capacities, are still likely to give significant, if not conclusive, weight to a polygraphist's opinion as to whether the defendant is being truthful or deceitful in his response to a question bearing on a dispositive issue in a criminal case. To the extent that the polygraph results are accepted as unimpeachable or conclusive by jurors, despite cautionary instructions by the trial judge, the jurors' traditional responsibility to collectively ascertain the facts and ajudge guilt or innocence is preempted." *United States v. Alexander, supra* at 168.

The problem of juries according undue prestige to polygraph evidence was reemphasized in *People v. Barbara,* 255 N.W.2d 171 at 194 (Mich. 1977): "[B]y use of the polygraph, we run dangerously close to substituting a trial by machine for a trial by jury."

[19] In *United States v. Wilson,* 361 F. Supp. 510 (D. Ct. Md. 1973) it was stated at 513 that the problem of undue influence on a jury may not be cured by cross-examination:

"The proponents of admissibility suggest that a jury can properly assess the competence and merit of the testimony of an examiner subjected to cross-examination. This contention is of dubious validity, as a rule. The cross-examination of an expert poses a formidable task; it is the rare attorney who knows as much as the expert. Given the numerous subtleties of interpretation inherent in modern polygraphy and the mysteriousness of the technique to the citizen, the danger of confusion of the jury is great. The jury may be misled, and may give undue weight to the testimony."

modern jury trial. Doctors of medicine, specializing in psychiatry and the behavioral sciences, have not developed nor marshalled their knowledge and resources to such a degree that the diagnosis and analysis of the human mind can be referred to as an exact science. Thus, by allowing this evidence to be received as expert testimony, are we not causing undue problems for the jury in its search for the truth and justice for all concerned, the litigants as well as the general public? Should we not improve the search for the truth and require a set of standards for all medical testimony of a psychiatric nature and require that expert witnesses be board certified and likewise should we not hasten the day to require that polygraphers be board certified with an acceptable set of prescribed standards of competence and expertise approved by the judicial system?

As we recognized in *State v. Stanislawski, supra,* the objection that polygraph testing has not gained general acceptance is no longer valid as a reason for rejecting polygraph evidence. Nevertheless, the opportunity for extraneous factors to influence the test results is so great, and the potential for leading the jury into collateral inquiries when it is considering polygraph evidence on the question of a witness' credibility is so clear, we established in *Stanislawski* a condition precedent to the admission of polygraph evidence. That condition is the written stipulation of the prosecutor, defense counsel and the person taking the test. That condition being satisfied, polygraph evidence is admissible on an issue of credibility in the discretion of the trial court, with a limited right of cross-examination and an appropriate instruction as to the purpose for which the evidence is admitted. This court's holding in *Stanislawski* that polygraph tests have general scientific acceptance underscores their usefulness as an investigative tool. Use of

the tests for investigative purposes is to be encouraged, not discouraged. The stipulation condition is designed to provide this encouragement in the fairest possible way. The requirement that the stipulation be entered into before the test is given insures that the polygraph examination is to be used as a tool in searching out the truth, not as a device for potentially confusing the jury.

Unless the stipulation is entered into, an expert opinion based on the results of a polygraph examination is not admissible evidence.

*By the Court.*—Judgment and orders affirmed.

CONNOR T. HANSEN, J. (*concurring*). I concur with the result reached in this case. However, as stated in a dissenting opinion in *State v. Mendoza,* 80 Wis.2d 122, 187, 258 N.W.2d 260 (1977), it is my opinion that the court should withdraw the stipulation rule enunciated in *State v. Stanislawski,* 62 Wis.2d 730, 216 N.W.2d 8 (1974), and hold that the results of a polygraph examination are not admissible evidence. *Fulton v. State,* 541 Pac.2d 871 (Okla. Crim. Ct. of App. 1975).